**DATALECT COMPUTER SERVICES, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–328C.

United States Court of Federal Claims.

Sept. 15, 1998.

Robert B. Breisblatt, Chicago, IL, with whom was Philip Dale Segrest, Jr., for plaintiff.

Brian S. Smith, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Anthony H. Anikeeff, for defendant. Major Stuart W. Risch, U.S. Army, Arlington, VA, of counsel.

## ORDER

MOODY R. TIDWELL, III, Senior Judge.

This case is before the court following trial on quantum, held June 1 to June 5, 1998 in London, England. On December 18, 1997, the court granted in part and denied in part defendant's motion for summary judgment as to entitlement and damages, and granted in part and denied in part plaintiff's cross-motion for partial summary judgment as to entitlement. The court found that defendant negligently prepared the statement of estimated needs in a requirements contract for computer repair services. In the damages phase of trial, plaintiff sought to recover DM 6,285,445 under a contract reformation theory and, in the alternative, DM 3.773,324 under an "increased cost" theory.[1] Defendant argued that plaintiff did not detrimentally rely on the estimate in preparing the bid and was therefore not entitled to recover damages. For the reasons discussed herein, the court finds that plaintiff has failed to meet its burden of proving the amount of damages.

## BACKGROUND

A detailed account of the facts surrounding this case can be found in the court's liability opinion, *Datalect Computer Services Ltd. v. United States,* 40 Fed.Cl. 28 (1997). A brief summary of relevant facts is provided below as background. The court's factual findings on quantum are contained in the Discussion section of this opinion.

On July 23, 1992, the U.S. Army Europe (USAEUR) issued an invitation for bids ("IFB") for the maintenance and repair of government-owned "tier-III" (freestanding, office-based, personal) computer equipment in Germany, Belgium, the United Kingdom and Italy (Blocks A, B, and C respectively). On February 5, 1993, USAREUR executed requirements contract No. DAJA37–93–D–0065 with plaintiff, Datalect Computer Services, Ltd. ("Datalect"), a corporation organized under the laws of the United Kingdom. In order to perform the contract, plaintiff established an office in Germany.

The solicitation required Datalect to submit individual unit contract line item number ("CLIN") prices for numerous repair functions. The contract, for a one-year term with three one-year options, began in March of 1993. Defendant exercised all of the options, and performance continued through March, 1997.

Pursuant to 48 C.F.R. § 16.503(a)(1) (1996), the IFB and resulting contract contained an estimate of the government's requirements based on the historical workload. This dispute arose when the quantity of actual service calls was significantly less than the estimated quantity of services stated in the solicitation. During the first four to six months of the contract, Datalect complained to the Army of a reduced call rate. The historical workload was 60 to 65 service calls per business day, while the actual service call rate under the Datalect contract fluctuated between 25 and 45 service calls per day.

On March 17, 1995, after several letters requesting information from USAREUR on the reduced call rate, plaintiff submitted a claim to the Army for an equitable adjustment based upon its assertion that the Army breached the contract by (1) failing to disclose all relevant facts necessary for Datalect to accurately prepare its bid and (2) failing to utilize Datalect to provide all of the government's requirements under the contract. Datalect claimed that its reliance on the government's estimated needs resulted in Data-

---

1. Plaintiff's damages claims were expressed in German deutschemarks throughout the litigation.

lect's bid being "unrealistically low" to the detriment of Datalect and to the benefit of USAREUR. On March 27, 1995, defendant denied Datalect's claim, finding that the estimated quantities in the solicitation were based on the most current information available.

Plaintiff filed a complaint in this court on May 8, 1995, seeking damages of DM 3,872,847 in compensation for its lost revenue, plus costs, and an injunction to prevent defendant from diverting service calls to its own maintenance facilities. Plaintiff argued that defendant breached its duty to consider certain relevant information when compiling the workload estimates, including: (1) the impending troop drawdown; (2) plans to purchase new computer equipment with extended warranties; and (3) the intention to perform self-maintenance. Plaintiff also argued that defendant breached the contract, depriving Datalect of service calls, by performing self-maintenance and utilizing extended warranty agreements on new computers. Defendant filed a motion for summary judgment as to both entitlement and damages. Plaintiff responded with a cross-motion for partial summary judgment as to entitlement.

In preparing a solicitation, the government is bound by a rather simple good faith standard which requires it to seek the most current information available, and either reformulate its estimate when warranted by the information available, or notify offerors of situations or factors likely to affect the estimate. *See* 48 C.F.R. § 16.503(a)(1) (1996); *see also Medart, Inc. v. Austin,* 967 F.2d 579, 582 (Fed.Cir.1992) (in formulating its estimate, the government must take into account information "reasonably available" to it). The estimate need not be exact, or even accurate, as long as it provides bidders with a fair opportunity to reasonably formulate their bids. In the liability phase, the court ruled that defendant was negligent in preparing its estimate because it failed to consider and disclose available information that was likely to affect the estimate. *Datalect,* 40 Fed.Cl. at 35. The court also held that the government did not breach the requirements contract by performing in-house maintenance

and utilizing extended warranty arrangements for tier-III maintenance and repair, because it was only required to utilize Datalect's services when it had a need to purchase such services, i.e. when it could not perform the work in-house or under warranty. *Id.* at 41–42.

The parties were directed to attempt to negotiate a settlement to the amount of damages. When those efforts failed, the damages issue was tried.

## DISCUSSION

 The party claiming entitlement to an equitable adjustment bears the burden of establishing the amount of the adjustment. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1392 (Fed.Cir.1987); *Nager Elec. Co. v. United States,* 194 Ct.Cl. 835, 853, 442 F.2d 936, 946 (1971). Thus, plaintiff herein bears the burden of proving, by a preponderance of the evidence, both the reasonableness of the costs claimed and their causal connection to the alleged events on which the claim is based. *S.W. Elecs. & Mfg. Corp.,* ASBCA 20698, 77–2 BCA ¶ 12,631, 1977 WL 2297, *aff'd,* 228 Ct.Cl. 333, 655 F.2d 1078 (1981). This burden, however, does not require a claimant to prove his damages with absolute certainty or mathematical exactitude. *Dale Constr. Co. v. United States,* 168 Ct.Cl. 692 (1964); *Houston Ready–Cut House Co. v. United States,* 119 Ct.Cl. 120, 96 F.Supp. 629 (1951). In *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 351 F.2d 956 (1965), the court observed:

It is sufficient if [claimant] furnishes the court with a reasonable basis for computation, even though the result is only approximate. *F.H. McGraw & Co. v. United States,* [131 Ct.Cl. 501, 130 F.Supp. 394 (1955)]; *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521 (1960). Yet this leniency as to the actual mechanics of computation does not relieve the contractor of his essential burden of establishing the fundamental facts of liability, causation and resultant injury. *River Construction Corp. v. United States,* [159 Ct.Cl. 254 (1962)]; *Addison Miller, Inc. v. United States,* 108 Ct.Cl. 513, 70 F.Supp. 893 (1947) ... *J.D. Hedin Construction Co. v. United States*

[171 Ct.Cl. 70, 86–87, 347 F.2d 235, 246–247 (1965) ]. It was plaintiffs' obligation in the case at bar to prove with reasonable certainty the extent of unreasonable delay which resulted from defendant's actions and to provide a basis for making a reasonably correct approximation of the damages which arose therefrom. *Aragona Construction Co., Inc. v. United States,* [165 Ct.Cl. 382 (1964) ]; *Laburnum Construction Corp. v. United States,* [163 Ct.Cl. 339, 325 F.2d 451 (1963) ]. Broad generalities and inferences to the effect that defendant must have caused some delay and damage because the contract took 318 days longer to complete than anticipated are not sufficient. *Commerce International Co. v. United States,* [167 Ct.Cl. 529, 338 F.2d 81 (1964) ].

*Wunderlich,* 351 F.2d at 968. *See American Line Builders, Inc. v. United States,* 26 Cl. Ct. 1155, 1181 (1992).

### Plaintiff's Case–in–Chief

At trial plaintiff presented two alternative claim calculation theories. Plaintiff's contract reformation theory was based on the difference between what it actually received under the contract and what it would have received if defendant had properly disclosed its estimated requirements. Datalect argued that if the estimate had been properly formulated, it would have bid substantially more for all of the CLINs because it would have known that there would be fewer total calls and that each call would be more expensive to service. Under the contract reformation theory, Datalect sought the difference between the revenue it actually received under the contract and the revenue it would have received, at the increased CLIN prices. Plaintiff alleged that this difference would amount to an additional payment of DM 6,285,445.

Plaintiff's alternative theory of damages was under an "increased costs" theory based upon a formula found in *In re Wheeler Bros.,* 79–1 B.C.A. (CCH) ¶ 13,642 (1979) (No. 20465). Plaintiff calculated equitable adjustments to the fixed costs, spare parts costs, and the profit margin on those costs. Under this theory, plaintiff alleged that it was entitled to an additional DM 3,773,324 as a result of the negligent estimate.

Mr. William Fattal, chairman and director of Datalect, testified that Datalect had been in the business of servicing computer equipment in the United Kingdom since 1983, and generally provided repair services on a fixed price basis. To determine repair costs, Datalect maintained a database of statistical information on repair rates for computer equipment, and used this information to formulate bid prices. The CLIN bids were actually prepared by Mr. Peter Watts, then in plaintiff's employ.

Mr. Fattal testified that shortly after Datalect began performing the Army contract, it realized that it was not receiving the expected rate of service calls. On October 24, 1994, Mr. Fattal wrote a letter to Mr. James Demetroulis, the Administrative Contracting Officer at USAEUR, complaining about the government's in-house maintenance efforts; the cannibalization of computer parts, resulting in service calls involving machines with missing parts; and service calls involving machines with multiple part failures.

Mr. Demetroulis responded to Mr. Fattal's letter on November 22, 1994. He agreed to consider reimbursing plaintiff for repairs involving multiple, unrelated part failures where it was clear that the failures were not due to normal wear and tear. In cases of cannibalization, Mr. Demetroulis requested that Datalect bill the call as a technical inspection and report the incident to the Army for investigation. Mr. Demetroulis also reiterated the government's position that the contract only required the government to call on Datalect when it needed to purchase goods and services. Mr. Demetroulis speculated that the reduced call rate was due to the purchase of 8,000 new tier III systems with three year warranties, the disposal of 3,000 obsolete machines, and the Army's closure of several facilities.

Mr. Fattal testified that Datalect did not account for three-year warranties in preparing its bid because such extended warranties were unprecedented in the computer industry in 1993. Mr. Fattal also testified that Datalect was not informed and was not aware of the government's self-maintenance

program when it prepared its bid. According to Mr. Fattal, Datalect interpreted the contract to mean that Datalect would get all service calls, not merely those for which the government could not repair itself. Mr. Fattal alleged that this belief was bolstered when the government changed the minimum order provision. Initially, the solicitation stated:

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than $250.00, the Government is not obligated to purchase, nor is the contractor obligated to furnish, those supplies or services under the contract.

This provision was amended on January 18, 1993 to read as follows:

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than $1.00, the Government is not obligated to purchase, nor is the contractor obligated to furnish, those supplies or services under the contract.

Mr. Fattal testified that Datalect materially altered its bid in response to this amendment. Datalect believed that this amendment virtually guaranteed that the government would do none of its own repairs and that Datalect would be called for even the simplest repairs. As a result, Datalect dramatically reduced its prices. The reasoning behind this price revision, according to Mr. Fattal, was that after the amendment, Datalect could reasonably expect to get all of the estimated calls on each item, not merely those in an amount less than $250.00. The additional calls would be "easy," less costly calls and the added volume would enable one engineer to service several calls in one site visit. Moreover, plaintiff's overhead costs would be defrayed among more calls, lowering the overhead charged against each call. Datalect's cost per call would be lower and the anticipated savings were reflected in the revised prices.

Mr. Alfie George Karmal, Datalect's sales and managing director, testified that he was plaintiff's sales director when the Army contract began. He reported directly to Mr. Peter Watts and was familiar with the proposal that was submitted to the Army.

Mr. Karmal testified that he "oversaw the interface between the sales team and Peter Watts, [and] was very much involved in all the calculations based upon key ratios within the business from [a] service and delivery perspective." (Tr. 6/1/98 at 205). Mr. Karmal also testified that Datalect relies on a statistical database of repair frequency to formulate its bid prices. He also corroborated Mr. Fattal's testimony that the change in the minimum order provision materially impacted Datalect's assumptions regarding the CLIN prices and prompted plaintiff to drop their prices by approximately 40%. He testified that Datalect was not aware of the government's self-maintenance program and that if Datalect had known of the self-maintenance, it would have bid the contract differently. Mr. Karmal also testified that Datalect was not advised that the Army would purchase new computers covered by extended warranties. If Datalect had been advised of these purchases, it would have submitted higher CLIN bids.

Mr. Karmal testified that plaintiff priced blocks A and B together and block C separately. Blocks A and B were priced together with the expectation that plaintiff would be awarded both blocks. Block C, involving Army installations in Italy, was separately priced because it carried higher costs. Mr. Karmal testified that he was aware that the government could award Datalect one, two, or all three blocks. He believed, however, that Datalect could refuse to accept a block, despite the fact that the solicitation did not recognize a right to refuse performance. Mr. Karmal testified that Datalect's bid was based on its expectation that there would be a high call density at each Army facility. Datalect planned to maximize the productivity of its engineers by having them service multiple calls per site visit.

Mr. Karmal did not provide testimony regarding Datalect's claim calculation theories and apparently was not involved in their development.

Mr. Nigel Mills, Datalect's technical director, likewise testified that Datalect maintains a computer database of statistics re-

lating to computer repair services. These statistics include call frequency, system failure rates, the nature of repairs, and staffing information; and Datalect ordinarily relies upon these statistics to formulate its bid prices. Mr. Mills outlined the staffing requirements for a typical service contract, the average time required to service a call, and the average failure rates for various system components. Mr. Mills, however, was not involved in preparing the Army bid, had no specific knowledge of the German operation, and played no role in formulating Datalect's claim calculation theories.

Mr. Michael Barford, a chartered accountant in England, provided expert testimony on behalf of plaintiff. Mr. Barford reviewed plaintiff's claim calculations and testified that they were properly calculated, "based upon the assumptions which lie behind some of them." (Tr. 6/2/98 at 297–298). Mr. Barford, however, did not develop the claim calculations or the assumptions behind them, and he did not determine how individual costs would be classified. Rather, the claim calculations were performed by Datalect and reviewed by Mr. Barford, who had "some input" in adjusting the numbers. (Tr. 6/2/98 at 311–313). In conducting his review, Mr. Barford visited Datalect on several occasions and held discussions with Mr. Fattal and "other employees of Datalect." (Tr. 6/2/98 at 296). Mr. Barford reviewed the books and records of the company, but he did not perform an audit. Moreover, he did not review, or even consider, the historical database referenced by plaintiff's other witnesses.

*Plaintiff's Contract Reformation Theory*

■ Datalect presented a claim calculation purportedly based on the difference between what it actually received under the contract and what it would have received if defendant had properly disclosed its estimated requirements. Datalect premised this calculation on an undated cash flow statement that was allegedly attached to plaintiff's November 1992 bid. (Plaintiff's Exhibit 5). This cash flow statement purported to demonstrate the cost and profit assumptions behind Datalect's original CLIN prices prior to the change in the minimum order provision. Plaintiff contends that the original CLIN prices more accurately reflect Datalect's pricing than the BAFO prices because, according to plaintiff, the BAFO prices were based on the mistaken belief that Datalect would perform all of the government's repairs. Datalect contends that even the original CLIN prices must be increased to cover the government's negligence in preparing the estimate.

Datalect's claimed CLIN prices purport to demonstrate what Datalect would have bid if the government's estimate had been properly reported. The revised CLIN prices were derived from the undated cash flow statement by making various adjustments to account for an anticipated annual call volume of 8,500. Thus, the total number of employees was reduced by 40%; "fixed costs" were reduced by approximately 30%; "variable costs" were reduced by approximately 50%; and "parts costs" were reduced by approximately 50%.[2] Datalect retained a 22.84% profit margin and distributed the additional costs over the projected number of calls.[3] This resulted in an increase in CLIN prices of 26.35%. The revised CLIN prices were then multiplied by the actual number of service calls to arrive at an adjusted revenue figure. Plaintiff's claim is for the difference between adjusted revenue and actual revenue.

Datalect's contract reformation claim calculation is fundamentally flawed. First, plaintiff provided no credible evidence to demonstrate how the original CLIN prices were formulated. While Datalect prides itself on maintaining a database of statistical repair data that it uses in bid preparation, plaintiff declined to share this vital information with the court. Instead, plaintiff produced a cash flow statement that purports to demonstrate projected expenses and project-

---

**2.** Defendant's expert witness, Mr. David Cotton, raised substantial questions regarding individual components of Datalect's hypothetical bid calculation. Mr. Cotton noted that several costs Datalect identifies as "fixed costs" appear to be variable costs. The distinction between fixed and variable costs is examined under plaintiff's increased costs claim calculation.

**3.** Datalect's profit margin is expressed as a percentage of total revenues rather than costs.

ed revenues. It provides little or no support for plaintiff's original CLIN prices. Mr. Fattal admitted that the CLIN bid prices were independently derived by Mr. Peter Watts prior to the creation of the cash-flow statement. This is significant because the factors supporting the original CLIN bid prices necessarily impact how the bid would change if the government had properly disclosed its estimated requirements. While Datalect seeks a universal price adjustment, plaintiff has provided no support for its assumption that proper disclosure of the government's requirements would have a uniform impact on all CLIN bid prices. Clearly, Datalect's CLIN bid prices were not formulated by dividing expected revenue by the expected number of calls. Datalect's universal price adjustment, therefore, does not accurately reflect Datalect's damages.

Second, the touchstone of plaintiff's contract reformation theory is the assumption that anticipated call volume in the first year of the contract would have been approximately half the number of calls the prior contractor received in fiscal year 1991. Thus, plaintiff contends that if it had been advised: (1) that the government was planning to do significant self-maintenance; (2) that the government would purchase new computers covered by extended warranties, and (3) that there was an impending troop drawdown; it would have projected a reduction in call volume of more than 50%. The problem with this assumption is that plaintiff has failed to provide any credible evidence to support it. In fact, Mr. Fattal candidly admitted that the 8,500 estimated calls per year that plaintiff used in the claim calculation was not the work of Peter Watts, who formulated Datalect's original bid, or an expert in bid preparation, but a product of hindsight, "I think in reality we used a bit of hindsight as well in the knowledge that it reduced [actual call volume] by about 50 percent. . . ."

(Tr. 6/1/98 at 148). In fact, in the first year of the contract Datalect received 9,725 calls.

Third, plaintiff's rationale for reverting to its original bid is that these prices more accurately reflect Datalect's pricing when it believed that the government would perform some of the calls less than $250. Further adjusting these prices to account for the government's failure to inform Datalect of its self-maintenance program is, at least to some degree, redundant. Mr. Fattal admitted that Datalect's original prices were based on the belief that it would not get all of the calls below the $250 minimum order provision while Datalect's revised prices were based on the belief that they would get virtually all of the call volume. The actual bid prices, therefore, are a more logical point from which to adjust the CLIN prices to account for defendant's negligent estimate.

Finally, the government successfully impeached Mr. Fattal's credibility regarding the technical aspects of bid preparation. Mr. Fattal testified that the claim calculation numbers were prepared by Datalect's accountant at Mr. Fattal's direction. Mr. Fattal was responsible for devising the assumptions behind the claim calculation. He began with the presumption that call volume would drop by half and that resources would drop accordingly. In some cases this resulted in a 50% drop in resources, in other cases, the reduction was significantly less.[4] With Mr. Fattal's presumptions, the accountant calculated the numbers that appear in Plaintiff's Exhibit 14. Mr. Fattal, however, admitted that he had no technical familiarity with computer repair or bid preparation. He was not involved in the day-to-day operations of Datalect and had no specific knowledge of how the Army contract was prepared. Instead, Mr. Peter Watts, a former employee of Datalect, was responsible for all day-to-day operations in 1993. It was Mr. Watts who was

---

4. Mr. Fattal did not apply technical knowledge in forming these assumptions. For example, Mr. Fattal testified that at a call volume of 17,000, Mr. Watts planned on using 19 engineers. If the call volume dropped to 8,500, Mr. Fattal estimated he would need 10 engineers. Mr. Fattal explained his methodology as follows:

I took of from . . . what is, to me, a fairly logical extension that if you do accept that the

number of calls reduces by half, then the resources you would need are considerably reduced, reduced from 35 people down to 21, some people you can't say, you know, take off, you know, like instead of three core controllers we end up with two. You can't end up with one and a half, and you wouldn't be able to do with one, that would be too low.

(Tr. 6/1/98 at 81).

familiar with Datalect's database and it was he who prepared the original bid. At one point, when the government pressed Mr. Fattal for technical details, he explained:

> ... now I'm not Mr. Watts, I'm not a technical expert on this, but he [Mr. Watts] would have looked at that ... to determine what price he [Mr. Watts] would put on that particular CLIN rate.

(Tr. 6/1/98 at 64). Given Mr. Fattal's complete lack of familiarity with the formulation of the original bid and the speculative nature of Datalect hypothetical bid, the court finds plaintiff's contract reformation theory unreasonable.

### Increased Cost Claim Calculation

■ Mr. Barford explained that Datalect's increased costs theory is based upon a formula found in *In re Wheeler Bros.*, 79–1 B.C.A. (CCH) ¶ 13,642 (1979) (No. 20465). Plaintiff calculated equitable adjustments to the fixed costs, spare parts costs, and the profit margin on those costs. According to Mr. Barford, Datalect's increased cost calculation is designed to account for damages resulting from the diminished call volume by apportioning Datalect's fixed costs over anticipated revenue to identify the fixed costs that plaintiff anticipated would be offset by revenue that was never actually received. Thus, for fixed costs, Mr. Barford applied the following equation:

Where: $R_A$ = Actual Revenue
$R_E$ = Estimated Revenue
$C_F$ = Actual Fixed Costs

Mr. Barford testified that "[f]ixed costs are costs which tend not to move with the level of activity of the business." (Tr. 6/2/98 at 304–305). To determine which costs were fixed costs, Mr. Barford relied upon Plaintiff's Exhibit 14. Mr. Barford calculated a fixed costs adjustment of DM 1,919,234. Mr. Barford then modified the *Wheeler* formula in an effort to account for Datalect's claim that its average parts costs per call were greater than expected. Thus, for parts costs, Mr. Barford applied the following equation:

Where: $R_A$ = Actual Revenue
$R_E$ = Estimated Revenue
$S_A$ = Actual Cost of Spare Parts
$S_E$ = Estimated Cost of Spare Parts

Applying the formula to the numbers found in Plaintiff's Exhibit 14, Mr. Barford calculated a spare parts adjustment of DM 1,444,964. Finally, Mr. Barford derived the following formula to calculate an equitable adjustment for the profit plaintiff would have made on the fixed costs and spare parts:

Where: $P_E$ = Expected Profit
$C_E$ = Expected Total Costs
$C_A$ = Equitable Adjustment to Fixed Costs and Spare Parts

Applying the formula, Mr. Barford calculated an additional profit of DM 558,541. The total claimed under the increased cost theory is DM 3,922,739.

Substantial questions surround the components of plaintiff's increased cost claim calculation. Foremost among these concerns is the classification of several costs as "fixed costs" and the lack of evidence supporting plaintiff's original CLIN prices.

Fixed costs are:

> Costs that do not vary with changes in output and would continue even if firm produced no output at all, such as most management expenses, interests on bonded debt, depreciation, property taxes, and other irreducible overhead.

*Black's Law Dictionary* 637 (6th ed.1990). Plaintiff's expert and defendant's expert concurred that the proper definition of "fixed costs" is those costs that do not vary with the volume of business. *Compare* (Tr. 6/2/98 at 304–305) *with* (Tr. 6/2/98 at 420–421). They did not, however, agree on whether individual components of plaintiff's increased cost theory were properly classified. Mr. Cotton testified that he had never seen a service contract where payroll costs were entirely fixed as they are in plaintiff's claim calculation. In reviewing Datalect's records, Mr. Cotton noted that Datalect's labor costs fluctuated throughout the contract period. Mr. Cotton noted that if labor cost varied, than several related costs should also vary.

When asked whether individual components of the claim calculation were properly characterized, Mr. Barford testified that he did not know. In fact, Mr. Barford testified that "officials at Datalect" were responsible for classifying costs as fixed or variable. (Tr.

6/2/98 at 313). Similarly, the court is unable to determine if plaintiff's claimed costs are properly characterized. Plaintiff has failed to provide sufficient evidence to support this claim.

As previously noted, Datalect provided very little information on how its bid was prepared. Datalect's increased cost calculation purports to demonstrate Datalect's projected costs and revenues at the time the bids were submitted as well as Datalect's actual costs in performing the Army contract. These figures, however, are not supported by the record. Datalect did not provide the court with contemporaneous evidence of the projected call volume, anticipated costs, or price calculations used in the preparation of Datalect's bid. While several witnesses testified that Datalect relies upon a statistical database to formulate its bids, no cost analysis was provided to support the Army bid prices. Thus, Plaintiff's Exhibit 14 includes claimed aggregate cost projections that are unsupported by evidence. Moreover, elements of plaintiff's cost calculation include expenditures which are not permitted under the Federal Acquisition Regulation. For example. plaintiff's cost adjustment claim includes an adjustment for "entertainment" costs seemingly in violation of 48 C.F.R. § 31.205–14. Plaintiff's increased cost claim calculation does not provide a reasonable basis for computing plaintiff's damages.

Plaintiff has failed to meet its burden of proving the claimed damages. Under plaintiff's hypothetical bid calculation and its increased cost calculation, plaintiff has failed to establish the reasonableness of the claimed damages and their causal connection to defendant's negligence. Plaintiff's failure goes beyond the pure mechanics of computation to a failure to prove essential elements of the calculations. Plaintiff provided no credible evidence supporting its original CLIN bid prices and insufficient evidence demonstrating the effect of the government's faulty estimate on the bid. Similarly, plaintiff's claimed costs are not adequately supported by credible evidence.

 The court has considered applying the "jury verdict method" of awarding damages. The jury verdict is highly disfavored. *Dawco Constr. Inc. v. United States,* 930 F.2d 872, 880–881 (Fed.1991). It is a method of last resort that may be employed where (1) there is clear proof of injury; (2) there is no more reliable method of computing damages; and (3) the evidence is sufficient for the court to make a fair and reasonable approximation of the damages. *WRB Corp. v. United States,* 183 Ct.Cl. 409, 425 (1968). While the court is persuaded that plaintiff incurred monetary injury as a result of defendant's faulty estimate, the jury verdict cannot be applied in this case. Plaintiff has not provided the court with sufficient evidence to make a reasonable approximation of the damages incurred. Thus, application of the jury verdict method would yield an arbitrary award.

## CONCLUSION

For the foregoing reasons, the court concludes that plaintiff is not entitled to recover. The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**