**MVM, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant,**

**and**

**Akal Security, Inc., Intervenor.**

No. 99–137C.

United States Court of Federal Claims.

Filed Under Seal Oct. 21, 1999.

Redacted and Modified for Publication on Feb. 22, 2000.*

---

\* After deciding this case, the Court allowed some time for the parties to suggest redactions. The Court has incorporated many of the suggested redactions, which are noted by brackets. In other places, the Court has rejected the proposed redactions because the language concerned parts of the opinion that was fundamental. If the language were redacted, the opinion would be incomprehensible.

In addition, while the decision was sealed, Akal filed a motion to vacate the decision under RCFC 60(b). The Court considered this motion in light of *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 25, 115 S.Ct. 386, 391–92, 130 L.Ed.2d 233 (1994); *In re United States*, 927 F.2d 626, 628 (D.C.Cir.1991) and *MAPCO Alaska Petroleum, Inc. v. United States*, 30 Fed.Cl. 153 (1993). The Court denied this motion primarily because the public may have some interest in the decision. First, offerors within the competitive range that are not parties received a benefit in that they are eligible to compete for the contract on resolicitation. Second, the Court hopes that its decision will prevent errors in the future.

For these reasons, the time between when the decision was issued under seal and when the redacted decision was released to the public was somewhat longer than usual.

James S. Phillips, Vienna, Virginia, for plaintiff. James S. DelSordo, Vienna, Virginia, of counsel.

James C. Caine, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant, with whom were Kathryn A. Bleecker, Assistant Director; David M. Cohen, Director; and David W. Ogden, Acting Assistant Attorney General. C. Joseph Carroll, U.S. Marshals Service, Arlington, Virginia, of counsel.

Donald E. Barnhill, San Antonio, Texas, for intervenor. Joan K. Fiorino and Edgar Garcia, San Antonio, Texas, of counsel.

## OPINION

DAMICH, Judge.

### I. Introduction

The Court finds that the government violated Federal Acquisition Regulations ("FAR") 15.206 by not issuing an amendment to a solicitation after the government changed the requirements of that solicitation. The Court, however, cannot resolve this case entirely because a genuine dispute about material facts precludes the Court from determining, on cross motions for summary judgment, whether the change in requirements prejudiced the disappointed bidder. Accordingly, additional proceedings are necessary to resolve this bid protest.

### II. Facts

#### A. Solicitation

The United States Marshals Service ("the agency") issued a Request for Proposals ("the solicitation") No. MS–98–R–0008 for Court Security Officers in seven judicial circuits in the United States. The agency ensures the safety of all federal courts and court employees against unauthorized, illegal, and potentially life-threatening activities.

Although the solicitation permitted the offerors to submit prices on any of the seven circuits involved, the agency treated each circuit as a separate bid and awarded a separate contract for each circuit. This protest concerns the Eleventh Circuit, for which Akal was awarded the contract. MVM, the plaintiff, is an unsuccessful bidder.

The solicitation informed bidders that the agency would consider three factors in reaching its decision: (1) technical skill, (2) price, and (3) past performance. They are listed in order of importance; technical skill is most important. The solicitation also states: "Between substantially equal technical proposals, the proposed price will be the determining factor in selection of a proposal for award." Administrative Record (hereinafter "AR"), Vol. 2, Tab 5, page 882. This case presents an issue involving prices; technical skill and past performance are not relevant.

The Eleventh Circuit as identified in the solicitation comprises nine separate judicial districts. One of those districts is the Northern District of Florida.

Amendment A003 modified Section B–2(c) of the solicitation. This amendment notified offerors that the agency reserved the right to set-aside the Northern District of Florida for a Section 8(a)[1] procurement at a later date.

#### B. Bidding Process and Evaluation of Prices

After the various offerors submitted their initial price proposals and before the offerors submitted their final and best offers, on January 14, 1999, the contracting officer ("CO") orally informed all bidders including MVM that the agency "anticipates making an 8a award for the Northern District of Florida which will reduce the Eleventh Circuit requirement."[2] AR, Vol. 19, Tab 44, page 7507. The CO's notes say "[MVM's response]." *Id.* In a price proposal, dated

---

1. Section 8(a) of the Small Business Act authorizes the Small Business Administration (SBA) to enter into contracts with other federal agencies and for the SBA to subcontract those contracts to disadvantaged small businesses. 15 U.S.C. § 637(a).

2. This quotation is taken from the CO's notes of the conversation.

January 20, 1999, MVM submitted prices that reflected an allocation of overhead expenses among eight districts; that is, no overhead was allocated to the Northern District of Florida.[3]

Best and final offers for the Eleventh Circuit were due from all offerors on February 17, 1999. At this time, the agency had not notified the offerors that the Northern District of Florida had been eliminated.

Both MVM and Akal submitted timely proposals. MVM and Akal offered different plans for addressing the Northern District of Florida. (As will be seen, a primary issue is whether Akal submitted a proper proposal.)

On February 26, 1999, the CO performed *two* price evaluations. When Florida was kept in the contract, MVM had the lowest price.[4] The United States and Akal stipulated to the fact that MVM had the lowest price.[5]

Another price evaluation was done with the Northern District of Florida having been removed from the contract. The CO determined that Akal had the lowest price. The CO determined the prices for all offerors by deducting the amount for the Northern District of Florida from the total bid price for the entire contract. This subtraction is the crux of the dispute.

|  | Total for nine districts | Amount the Contractor Attributed to Northern District of Florida. | Revised Total for eight districts |
|---|---|---|---|
| Akal | $80,470,196.00 | [some dollar amount] | [some dollar amount] |
| MVM | $80,388,706.90 | [some dollar amount] | [some dollar amount] |

## C. Award and Protest

The agency decided to remove the Northern District of Florida from the contract. No one has challenged the agency's decision to set aside the Northern District of Florida in any way. After a small glitch was resolved,[6] the agency awarded the contract to Akal. The contract was awarded based on the total price Akal proposed minus the price that Akal allocated to the Northern District of Florida. MVM filed this protest.

MVM has narrowed this dispute to two concrete issues. First, did the agency violate FAR 15.206 by not resoliciting the contract after it removed the Northern District of Florida? Second, did the agency reasonably compare the prices from Akal and MVM?

## D. Procedural Posture

The original complaint in this case was filed on March 17, 1999. It contained many allegations and legal theories that were later dropped. The parties proceeded through

3. Akal asserts that the January 20, 1999, price proposals make moot MVM's concerns, raised in the January 14, 1999, discussions. According to Akal, MVM considered how removing the Northern District of Florida would affect its overhead costs. This argument is flawed because this case concerns Akal's price proposal, not MVM's.

4. Initially, the CO erroneously determined that the price of another bidder (U.I.I.S.) was lower. An earlier related bid protest corrected this error.

5. Although Akal stipulated that MVM's price for nine districts was lower than Akal's price for nine districts, Akal did not agree that "but for" the CO decision to remove the Northern District of Florida, the CO would have awarded the contract to MVM. This dispute is entirely hypothetical because the CO did decide to remove the Northern District of Florida.

6. The agency originally awarded the contract to U.I.I.S. on the grounds that U.I.I.S. was equivalent in technical proficiency and offered the lowest price. Akal protested this decision and alleged, among other things, that the agency did not calculate the figures for prices correctly After receiving Akal's protest, the agency determined that it erred in calculation. Accordingly, after correcting this computational error, the agency terminated the award to U.I.I.S. and awarded the contract to Akal. AR, Vol. 20, Tab 56, page 7779.

Throughout this opinion, the Court will refer to the agency's award to Akal. Other than as part of the procedural history of this case, the agency's erroneous award to U.I.I.S. is not relevant to the Court's decision.

various stages, including the filing of the administrative record and the filing of requests for supplements to the administrative record.

The parties filed motions for summary judgment on June 10, 1999, and objections to the motions were filed on July 9, 1999.[7] Previously, the parties had agreed to waive their rights to file reply briefs. MVM's briefs contained two new items. First, MVM included an affidavit from Terry Carlson, who presented an evaluation of Akal's bid based upon his experience in the treatment of costs in government contracts. Second, MVM raised the question of whether the agency violated FAR 15.206.

The Court intended to hold oral argument on the pending motions for summary judgment on July 20, 1999. In this hearing, the Court determined that the record needed correction and/or clarification. Further argument was postponed.

On July 23, 1999, MVM filed a motion to supplement the administrative record with Carlson's affidavit and a motion for leave to amend the complaint. Despite opposition from both the United States and Akal on both motions, the Court granted both.

The Court permitted all parties to file supplemental briefs on the motions for summary judgment. The supplemental briefs addressed the two remaining issues, which are discussed in this opinion. Finally, the Court heard oral argument on these two issues in the cross-motions for summary judgment on September 13, 1999.

## III. Standard in Ruling on Motions for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed. Cir.1993). A fact is material if it might significantly affect the outcome of the suit

under the governing law. *Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. at 248, 106 S.Ct. at 2510. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed.Cir.1998) and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995).

The fact that both parties have moved for summary judgment is not an admission that no material facts remain in issue. *Massey v. Del Laboratories, Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997). *See also Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir.1988). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed.Cir. 1998). Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Cincom Systems, Inc. v. United States*, 37 Fed. Cl. 663, 671 (1997).

## IV. Bid Protest Jurisdiction

The 1996 amendments to the Tucker Act grant this Court jurisdiction to hear post-award bid protest cases. *See* 28 U.S.C. § 1491(b)(1). The Court reviews the challenged agency action according to the standards set out in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). Accordingly, the court must determine whether the actions of the United States in awarding the contract were:

---

7. Because counsel for Akal is located in Texas. Akal was generally permitted one extra day to

file documents in court.

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law.

5 U.S.C. § 706(2).

■ In determining whether the government has acted arbitrarily or capriciously towards the Plaintiff, the court considers four criteria. *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974): whether (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Id.; Metric Sys. Corp. v. United States,* 42 Fed. Cl. 306, 310 (1998). There is, however, "no requirement or implication ... that each of the factors must be present in order to establish arbitrary and capricious action by the Government." *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir. 1988).

## V. Did the agency violate FAR 15.206?

### A. Introduction

FAR 15.206 provides: "When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." FAR 15.206(a).

Under the broad topic of FAR 15.206, there are three issues. First, whether MVM's challenge was timely. Second, whether the contract really changed. Third, whether MVM was prejudiced by the change. The Court will discuss the first and second points under separate headings. The third question is answered within the Court's extended discussion of whether the agency reasonably evaluated Akal's price.

### B. Did MVM waive its right to challenge the change?

■ *Allied Technology Group, Inc. v. United States,* 39 Fed.Cl. 125, 146 (1997), and *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358, *aff'd,* 39 F.3d 1198 (1994), require challenges to the facial terms of the solicitation to be made before the award of the contract. If the protestor waits until after the award, the protestor *may* be considered to have waived this challenge.

The United States and Akal argue that MVM had a duty to raise the issue about the Northern District of Florida because MVM knew, from Amendment A003, that the Northern District of Florida could be removed. Akal points out that MVM had multiple opportunities to raise its concerns. MVM could have asked a question during the written question-and-answer period. MVM could have filed an informal protest before the agency or a formal pre-award protest at the General Accounting Office (GAO) or Court of Federal Claims. Because MVM did none of these, Akal argues that MVM waived its right to protest.

Whether MVM's protest was raised on a timely basis depends, critically, on when the decision to eliminate the Northern District of Florida was made. As a matter of logic, the Court finds that this decision must have been made before the contract was awarded.[8] This time is one boundary for the range of time during which the decision must have been made. The other boundary is the date of Best and Final Offers ("BAFOs"). When the parties submitted their BAFOs, the agency had not communicated any decision that it decided to eliminate the Northern District of Florida. Absent any evidence to the contrary, the Court presumes that the decision was made after the agency received the BAFOs. Thus, the Court finds that the agency decided to eliminate the Northern District of Florida after February 17, 1999, the date for submission of BAFOs, and before February 26, 1999, the date the contract was awarded.

■ This finding means that the argument that MVM delayed raising its challenge must be rejected. Until the agency actually decided to change the requirements, the bidders did not know the requirements had changed. Put another way, until the agency actually communicated its decision to change the requirements, the bidders could not protest.

---

**8.** The government agreed with this point at oral argument.

In this case, the agency did not inform the bidders the requirements had changed until after the agency had awarded the contract. Accordingly, as a simple matter of logic, it was impossible for MVM to raise FAR 15.206 before the contract was awarded.

The United States and Akal stress the fact that the solicitation, from the beginning, alerted the bidders that the Northern District of Florida may be removed from the contract. Although this fact is true, it is legally irrelevant. Until the agency decided to eliminate the Northern District of Florida, the solicitation contained nine districts in the Eleventh Circuit. Statements that the agency "may eliminate" or that the agency "anticipates eliminating" are entirely different from a statement that the agency "is eliminating" the Northern District of Florida.[9]

Similarly, MVM did not have an obligation to clarify any "ambiguity" in the solicitation. The solicitation never was ambiguous. For some time, the solicitation required security services in nine districts in the Eleventh Circuit. At this time, the solicitation warned that one district could be removed. Despite this warning, the solicitation was clear that there were nine districts. The warning that the solicitation may change does not make the original solicitation ambiguous. Therefore, MVM had no duty to address an ambiguity because there was no ambiguity.

### C. Did the solicitation change?

■ By its terms, FAR 15.206 requires a new solicitation when "the Government *changes* its requirements or terms and conditions." The parties dispute whether the solicitation changed.

According to MVM, this case is analogous to *Beta Analytics Intern., Inc. v. United States*, 44 Fed.Cl. 131, 139 (1999) and *Candle Corp. v. United States*, 40 Fed.Cl. 658, 665

(1998). In these cases, the Court found that the government violated FAR 15.206.

The United States and Akal distinguish *Beta Analytics* and *Candle*. Instead of these cases, the United States offers *SC & A, Inc.*, B–270160.2, 96–1 CPD ¶ 197; and *Sea–Land Service, Inc.*, B–219655.2, 85–2 CPD ¶ 677. According to the United States, these cases say if there is only a mere possibility that some of the work may not be required, the government has no duty to amend the solicitation.

In addition to distinguishing the Plaintiff's cases, Akal presents an argument that whether the Northern District of Florida would remain in a contract was a risk that the bidders must consider in submitting their bids. Akal claims a solicitation does not have to be so detailed to eliminate all performance uncertainties and cites *Sunrise International Group, Inc.*, B–261448, July 21, 1995, 95–2 CPD ¶ 43.

The Court holds that the terms of the solicitation changed. The Court reaches this conclusion by reasoning and by analyzing the terms of the solicitation, since all cases cited by the parties on this issue have facts far too different to be persuasive. As originally proposed and as bid on, the solicitation required the contractor to provide courthouse security to nine districts in the Eleventh Circuit. As awarded, the contract required Akal to provide courthouse security to eight districts. As a matter of law, the elimination of an entire district constitutes a change necessitating an amendment to the solicitation under FAR 15.206.

### D. Holding regarding FAR 15.206

The Court holds that FAR 15.206 was violated. When the agency decided to eliminate the Northern District of Florida, the agency should have amended the solicitation

---

9. As part of its argument, Akal contends that MVM had a duty to inquire about the method for removing the Northern District of Florida. For example, MVM could have asked the agency to state when it would decide whether the Northern District of Florida was in or out of the contract and could have asked the agency to explain how it would accomplish the removal.

These questions would have been appropriate, certainly. Perhaps, if they had been asked, the need for this bid protest would have been obviated.

Although the bidders had an opportunity to seek additional information from the agency about the possibility that the requirements of the contract may change, this opportunity does not cancel the requirement under FAR 15.206 that the agency communicate the change. Even when the agency provides an advance warning that the requirements may change, the agency still must comply with FAR 15.206 by issuing an amendment when the solicitation changes.

and should have requested new bids. The Court holds that the Plaintiff met its requirement under the APA by establishing a violation of pertinent regulation. *See Keco Indus., Inc. v. United States, supra,* 492 F.2d at 1203–04.

Despite finding a violation of procurement law, the Court may grant the relief the Plaintiff requests only if the Plaintiff establishes that the violation prejudiced it. *See Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999); *Candle v. United States, supra,* 40 Fed.Cl. at 665 (finding a violation of procurement law but no prejudice). The Court will address the issue of prejudice in the next section on whether the agency reasonably evaluated Akal's price.

## VI. Did the agency's procurement violation prejudice MVM?

### A. Bidding

On December 22, 1998, the government issued Amendment A012 to the Solicitation. Amendment A012 states as follows:

Section L–4c(7) is amended to include the escalation factor for Site Supervisors and LCSOs as follows:

The following provides a sample of an hourly rate cost breakout:

| | |
|---|---|
| Direct Labor [1] | $xx.xx |
| Cost Adjustment | $xx.xx |
| Escalation Factor [1a] | $xx.xx |
| Fringe Benefits [2] | $xx.xx |
| Taxes [3] | $xx.xx |
| Other Direct Costs [4] | $xx.xx |
| Indirect Costs [5] | $xx.xx |
| Profit [6] | $xx.xx |
| Proposed Burdened Hourly Rate [7] | $xx.xx |

[1] Direct Labor includes all direct wages, directly chargeable to the Contract. This is to be done separately for all sites.

[1a] Escalation Factor for Site Supervisors and LCSOs. Offerors should propose both a cost for escalation and a percentage.

[2] Fringe Benefits include all payments made directly to or for the CSO which are directly charged to the Contract, including but not limited to: (1) vacation pay, (2) sick leave, (3) health and welfare, and (4) life insurance. This category does not include tax payments for Governmental legislated fringe benefits such as Social Security or Unemployment Taxes.

**10.** The solicitation set the minimum hourly wage

[3] Taxes include all federal, state and local taxes which are directly chargeable to the direct labor rate. Each tax, e.g., FICA, should have the applicable amount together with supporting information explaining how the amount was computed, e.g., if state unemployment tax was 1.5% on the first $8,000.

[4] Other Direct Costs includes all other allowable costs that can be identified specifically with the Contract.

[5] Indirect Costs include costs associated with overhead or corporate G & A. The basis for determining these amounts and the percentage rates must be included.

[6] Profit—Provide the percentage rate and the total amount.

[7] Burdened Hourly Rate—The cumulative total of the above costs.

Thus, "Fully Burdened Rates" are composed of the Direct Labor,[10] and other items, such as taxes and fringe benefits. Significantly, the term "Fully Burdened Rates" includes "Other Direct Costs" and "Indirect Costs" such as overhead or corporate G & A, General and Administrative Costs.

In its bid, Akal included elements for "other direct costs" and "G & A" as part of its bid for the Northern District of Florida. In contrast, MVM maintains—and neither the United States nor Akal challenges—that MVM did not include these elements for the Northern District of Florida. MVM and Akal each submitted affidavits from experts who offer an opinion on whether Akal acted properly. Before addressing the substance of the affidavits, the Court will discuss certain legal arguments made to prevent the Court from considering the experts' affidavits.

### B. Court's authority to consider price changes

The United States and Akal contend that if the Court were to examine the prices, the Court would be wrongly engaging in cost realism analysis. The United States and Akal stress, repeatedly, that cost realism analysis is appropriate only in cost-reimbursement contracts. Since this contract was a fixed-price contract, cost realism analysis should not be done. Before explaining

which all bidders were required to pay.

why the Court is not persuaded by this argument, the Court will briefly describe cost realism analysis and price analysis, an alternative method of analyzing prices.

FAR 15.404–1 is the starting point. This regulation describes various methods for evaluating offers. In pertinent part, it provides:

(a) General. The objective of proposal analysis is to ensure that the final agreed-to price is fair and reasonable.

(1) The contracting officer is responsible for evaluating the reasonableness of the offered prices. The analytical techniques and procedures described in this section may be used, singly or in combination with others, to ensure that the final price is fair and reasonable. The complexity and circumstances of each acquisition should determine the level of detail of the analysis required.

(2) Price analysis shall be used when cost or pricing data are not required (see paragraph (b) of this subsection and 15.404–3).

    \*     \*     \*     \*     \*     \*

(b) Price analysis.

(1) Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit.

(2) The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances surrounding the acquisition. Examples of such techniques include, but are not limited to the following:

(i) Comparison of proposed prices received in response to the solicitation.

(ii) Comparison of previously proposed prices and contract prices with current proposed prices for the same or similar end items, if both the validity of the comparison and the reasonableness of the previous price(s) can be established.

    \*     \*     \*     \*     \*     \*

(d) Cost realism analysis.

(1) Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

(2) Cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror.

FAR 15.404–1.

Cost realism analysis and price analysis differ. Under cost realism analysis, the agency examining the bids looks at the individual items that comprise the bid. Cost realism analysis is required in cost-reimbursement contracts because the government must ensure that the bidder is submitting accurate costs. In contrast, price analysis focuses on the bottom-line prices. The government is not concerned about the individual elements because the competition between offerors should ensure that the government receives a fair price.

According to the United States, the agency does not need to determine the "cost realism" of elements in contracts with fixed-price hourly rates, such as this contract. *Lear Siegler Services, Inc.*, 98–2 CPD ¶ 136; *Volmar Construction, Inc.*, 96–2 CPD ¶ 119. Further, the agency also does not need to examine overhead allocation. *Am–Pro Protective Agency, Inc.; MVM, Inc.*, B–271385.4, 96–2 CPD ¶ 192.

The United States argues that this Court should defer to the agency's actions when the agency used price analysis. The record shows that the agency complied with FAR 15.404–1 when it compared the prices of the offerors. Therefore, the agency acted within its discretion. If the Court were to look beyond the prices, the Court would be usurping the agency discretion to select the method of proposal evaluation and would be engaging in cost realism analysis.

For two reasons, the Court rejects this argument, which, if accepted, would prevent the Court from considering the substance of the experts' affidavits. First, price analysis

assumes that the bidders are bidding on the identical job. The only way to ensure adequate competition is to have bidders compete on an equal basis. *See Candle v. United States, supra,* 40 Fed.Cl. at 665 (citing 10 U.S.C. § 2305(a)(1)(A)(i)). *See also TRW Environmental Safety Systems, Inc. v. United States,* 18 Cl.Ct. 33, 43 (1989) (stating "the ultimate obligation of the agency is to treat all bidders fairly and give full consideration to all bids."). Implicit in the law's requirement that competition for government contracts be "free and fair" is a further requirement that bidders are bidding on the same job. A competition in which one offeror is proposing prices based on eight districts and another is proposing prices based on nine districts is not fair. The present case is therefore analogous to *Lockheed Aeronautical Systems, Co.,* B–252235.2, 1993 WL 306522, a case in which a bid protest was sustained. The GAO reasoned:

> [b]y accepting without question Chrysler's (and other offerors') MTBF [mean time between removals] and temperature figures, the Air Force created a situation where it was faced with comparing "apples and oranges"; offerors' dramatically different unexplained, unevaluated assumptions resulted in costs figures that could neither be meaningfully compared nor assessed for purposes of determining the likely ultimate cost to the government. The evaluation was therefore inherently improper.

*Id.,* 1993 WL 306522, at *4. Likewise, in this case, the agency could not compare the bid prices of MVM and Akal because the bids were based on different assumptions, an assumption caused by the agency's failure to notify the offerors that it eliminated the Northern District of Florida.

A comparison between bids for the same job explains why MVM may complain about

Akal's bid. As discussed below, MVM argues that its bid was proper and that Akal's bid was not proper. The United States argues that MVM cannot show that it was prejudiced because MVM does not claim that it would have acted differently if the amendment had been issued. The law, however, does not limit a showing of prejudice to claims that the protestor would have acted differently. Instead, a protester is permitted to argue that the awardee's bid did not conform to the requirements of the solicitation and that the protestor is prejudiced by the agency's failure to enforce the terms of the solicitation. *See, e.g., Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365 (Fed.Cir. 1999) (upholding bid protest that awardee did not comply with terms of solicitation).

As a second reason for considering the affidavits of the experts, the Court also notes that the agency, itself, did not confine itself to "price reasonableness" strictly. The agency accepted bids on the job, and the bids, as required by the solicitation, included a total figure and the individual components of the nine districts. The critical number was the "total" figure, that is, the bottom-line figure. The amount of MVM's bid was $80,388,706.90; the amount of Akal's bid was $80,470,196.00. The agency subtracted the price for the Northern District of Florida from the bid of each bidder. In doing so, the agency was engaging in something more than "price reasonableness." Pursuant to 5 U.S.C. § 706(2), this Court has the authority to review the agency's method of subtraction to ensure that the agency did not act arbitrarily or capriciously.[11] This review includes not just the mathematics but also the source of the numbers that are subtracted.

Accordingly, the Court rules that it has the authority to consider whether the agency acted reasonably in how it subtracted the price for the Northern District of Florida.[12]

---

11. For example, the United States conceded at oral argument that if the agency made a computational error, the Court has the authority to correct a simple mistake of arithmetic.

12. There is a third, but less important, reason for the Court's decision. To the extent that the Court is engaging in "cost realism analysis," FAR 15.404–1 does not forbid this type of analysis in a fixed-price contract.

> The contracting officer is responsible for evaluating the reasonableness of the offered prices. The analytical techniques and procedures described in this section may be used, *singly or in combination with others,* to ensure that the final price is fair and reasonable. The complexity and circumstances of each acquisition should determine the level of detail of the analysis required.

This analysis requires a consideration of the affidavits from the experts.

### C. How did Akal treat prices in the Northern District of Florida?

The Court has now reached a critical question in this case, the question of whether the agency properly deducted the cost of the Northern District of Florida from Akal's bid.[13] This question revolves around how Akal treated two elements: "Other Direct Costs" (ODCs) and "General & Administrative" (G & A).

The terms of the solicitation with regard to pricing is set out in Section A, above. The important fact is that bidders presented ODCs and G & A expenses as part of its "fully burdened rates."

In its bid, Akal stated that it treated [certain items] as ODCs. Its bid also states, [how it priced ODCs]. *See, e.g.*, AR, Vol. 15, Tab 39, page 6163.

In support of its motion for summary judgment, MVM submitted an affidavit from Ter-

ry Carlson, who characterized himself as an expert in government contracts.[14] Carlson opined that the ODCs are fixed. They exist as a cost to Akal regardless of whether the contract includes the Northern District of Florida.

Carlson calculated the amount by which Akal's bid for the Northern District of Florida included fixed costs. He believes that [some dollar amount] in "Other Direct Costs" should have been added to (or stated another way, should not have been subtracted from) Akal's bid. In addition, Carlson believes that [some dollar amount] in "G & A" should have been added to (or stated another way, should not have been subtracted from) Akal's bid.

Significantly, if either the ODCs or the G & A were added to Akal's bid, its bid would be more than MVM's bid. Through Carlson's affidavit, MVM has established that the failure to amend the solicitation prejudiced it.

Carlson's affidavit, however, is opposed. Akal presented the affidavit of its expert,

---

FAR 15.404–1(a)(1) (emphasis added).

The Court finds that the circumstances of this solicitation, in which the agency decided to eliminate one of nine districts in which work would be performed after the agency received BAFOs, required a more detailed level of analysis. The appropriate level of analysis should have included whether the agency was making a fair subtraction.

13. The United States maintains that the Administrative Record clearly shows what the CO did. The United States, therefore, argues that the Court should look only at the acts of the CO and decide whether the CO acted properly.

The Court agrees that the factual record is clear. The Administrative Record indicates that the CO subtracted the bidders' price for the Northern District of Florida from the bidders' total price. In a stipulation between MVM and the United States that supplemented the Administrative Record as it was originally filed, the government represented that the CO did not analyze the prices separately. *See* AR, Tab 73, pages 8661–63. The Court has determined that the agency violated FAR 15.206. *See* Section V of this opinion.

Although the agency's actions are clear and despite the United States' argument, the Court cannot end its inquiry at this stage. The Court must determine whether the procurement violation prejudiced the protester. The Court needs to examine whether the CO's approach in "simply" subtracting the numbers was sufficient. For this task, the expert affidavits are helpful. Fur-

ther, the *agency* cannot fill in the gaps in the administrative record because the agency did not determine how the elimination of the Northern District of Florida affected the bids of Akal and MVM. Therefore, the Court permitted MVM and Akal to supplement the administrative record with affidavits from experts. *See also*, footnote 14, below.

14. Before the Court considered Carlson's affidavit, MVM filed a motion to supplement the administrative record. Despite vociferous objection from the United States and Akal, the Court granted MVM's motion.

The Court applied the standards from *Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 345, 349–50 (1997) and *Esch v. Yeutter*, 876 F.2d 976 (D.C.Cir.1989). "While an agency's technical expertise concerning its unique procurement requirements is entitled to some deference, 'the court [of course] must ... perform an informed review of even technical decisions in order to meaningfully exercise its jurisdiction.'" *Pikes Peak Family Housing, LLC v. United States*, 40 Fed.Cl. 673, 677 (1998).

The Court granted the motion because Carlson's affidavit met the first, second and fourth factors listed in *Esch*: (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; and (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly.

Peter A. McDonald. McDonald believes that Akal's costs were not fixed with respect to either ODC or G & A.

McDonald disagrees with Carlson's methodology in converting the ODC into a percentage to establish how much cost is fixed. McDonald believes that Akal "bid their ODCs on a pennies per labor hour basis." When the amount of labor hours decreased, the ODCs also decreased.

McDonald also has the opinion that Akal's bid assumes that G & A costs vary, proportionally, with the labor costs. When there are more labor costs, then G & A increases. However, when labor cost decreases (such as when the Northern District of Florida is removed), then G & A decreases.

The two expert opinions before the Court differ on the critical question of whether ODCs and G & A for Akal are fixed. In each party's brief, the party discredits the findings of the other side's expert.

Akal claims that Carlson's affidavit does not create a genuine dispute about material fact because Carlson's "opinions and conclusions are based on Mr. Carlson's manipulation of the proposal of Akal in such a way that appears nowhere in the record. Mr. Carlson's affidavit is based on speculation, not the administrative record." Akal cites *IMS Services, Inc. v. United States*, 33 Fed. Cl. 167, 176 (1995), to support its case.

The Court does not agree with this argument. The Court understands Akal to be arguing that the Court should not consider Carlson's affidavit because the agency did not have Carlson's affidavit prior to awarding the contract. As noted in footnote 14, above, Carlson's affidavit was made a part of the administrative record before the Court; therefore, the Court may consider it.[15] Moreover, the information contained in Carlson's affidavit is based on the figures before the agency. Because the CO had the same information as Carlson, the CO could have reached the same conclusion as he did, if the CO had wanted to keep all of Akal's "fixed costs" within its bid. Because Akal's bid—

which unquestionably is part of the administrative record and was before the agency—contains all the data necessary to reach Carlson's conclusion, Carlson's affidavit is not speculative.

Further, the case on which Akal relies does not support its argument. *IMS Services* stands for the limited proposition that a dispute about a *non-material* fact does not preclude summary judgment. This statement does not apply to this situation because whether Akal's price is correct is certainly material.

Accordingly, the Court must accept Carlson's affidavit as true, when considering the motions for summary judgment filed by the United States and Akal. Therefore, these motions must be denied.

Likewise, MVM attempts to eliminate McDonald's affidavit so that it would not be an impediment to granting MVM's own motion for summary judgment. Because McDonald's affidavit is based on an opinion that Akal's ODCs and G & A costs are not fixed, MVM presents a legal argument that ODCs and G & A costs are fixed as a matter of law. In doing so, MVM attempts to persuade the Court to "disregard the conclusions of an expert opinion grounded in an error of law." *Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 533 n. 14 (5th Cir.1999).

To support its legal argument, MVM relies on *Datalect Computer Services, Ltd. v. United States*, 41 Fed.Cl. 720, 727 (1998), *aff'd* 215 F.3d 1344, 1999 WL 507144 (Fed.Cir. July 15, 1999) (table) (quoting Black's Law Dictionary (6th Ed.1990) for the definition of "fixed costs"); *Stearns Airport Equipment Co., Inc. v. FMC Corp.*, *supra*, 170 F.3d at 532–34 (holding that G & A is a "fixed cost" item) and *Deval Corp.*, ASBCA No. 47132, 99–1 BCA ¶ 30182, 1998 WL 883199 (holding G & A and overhead are "fixed cost" items).

The Court disagrees with MVM's argument that the Court can rule, as a matter of law, that Akal's ODCs and G & A costs are "fixed." In *Stearns Airport*, the court had a

---

15. This case presents another example of how the "administrative record" in a bid protest case differs from the "administrative record" in a contested proceeding before the agency. *See Cu-*

*bic Applications, Inc. v. United States*, 37 Fed.Cl. 345, 350 (1997)(describing artificiality of administrative record in bid protest cases).

completely developed factual record. Likewise, in *Deval Corp.*, the Board of Contract Appeals also had a completely developed factual record. These cases cannot stand for the proposition that ODCs and G & A costs are *always* fixed costs. Instead, under the particular facts before it, the court or board made a ruling. Thus, this Court cannot rule, as a matter of law, that McDonald's opinion should be rejected out of hand.

Because the Court must credit McDonald's affidavit when ruling on MVM's motion for summary judgment, the Court denies MVM's motion. A genuine dispute, based upon McDonald's affidavit, precludes an entry of summary judgment in MVM's favor.

## VII. Conclusion

The Court rules, as a matter of law, that the agency violated FAR 15.206 when it did not amend the solicitation after removing the Northern District of Florida. The Court also finds that the parties have raised a genuine dispute over the factual question of whether the lack of an amendment prejudiced MVM. Accordingly, additional proceedings to resolve this factual dispute will be necessary.

By November 22, 1999, the parties shall file requests for redaction of protected/privileged material before the Court issues its published opinion.

**IT IS SO ORDERED.**