**PORTFOLIO DISPOSITION MANAGEMENT GROUP LLC, Plaintiff,**

v.

**The UNITED STATES of America, Defendant,**

and

**Harrington, Moran & Barksdale, Inc., Intervenor–Defendant.**

No. 04–1671C.

United States Court of Federal Claims.

Filed: Feb. 1, 2005 Under Seal.

Reissued for Publication Feb. 24, 2005.

**2**

ment on its Motion for Judgment on the Administrative Record and rejected Plaintiff's request for injunctive relief. This written opinion sets forth in more detail the reasons for our rulings.

James Stephen DelSordo, Washington, D.C., for Plaintiff.

Marla T. Conneely, with whom were Peter D. Keisler, David M. Cohen, and Robert E. Kirschman, Jr., Department of Justice, Washington, D.C., for Defendant. Rachael Blackburn, Department of Housing and Urban Development, Of Counsel.

Alexander J. Brittin, Washington, D.C., for Intervenor–Defendant.

John Bergen, law clerk.

### OPINION

BASKIR, Judge.

This case involves a post-award bid protest. Plaintiff, Portfolio Disposition Management Group ("PDM"), was unsuccessful in its bid to manage, market and oversee sales activity for single-family homes owned by the U.S. Department of Housing and Urban Development ("HUD"). The contract went to a competing bidder, Harrington, Moran, Barksdale, Inc. ("HMBI"), who offered to perform the services at a substantially lower cost. PDM seeks declaratory and injunctive relief to prevent HUD from continuing to perform the contract with HMBI, claiming, first, that the agency should not have considered HMBI in the competitive range and, second, that the agency improperly changed certain requirements of the Solicitation after awarding the contract.

At the outset of this litigation we granted a motion by HMBI to intervene. We then put in place an expedited briefing schedule to which all parties had agreed, in order to take up cross-motions for judgment on the administrative record pursuant to RCFC 56.1. In light of the proposed schedule, PDM opted to combine its initial motion for preliminary injunction with its RCFC 56.1 motion in support of a permanent injunction. At the oral argument we ruled in favor of the Govern-

### BACKGROUND

*The Procurement*

On August 6, 2003, HUD announced its intention to award a number of indefinite quantity and indefinite delivery contracts for management and marketing services, so-called "M & M contracts," requiring contractors to:

> monitor mortgagee compliance with the Department's property conveyance requirements, to successfully manage single family properties owned by, or in the custody of [HUD], to successfully market those single family properties which are owned by HUD, and to successfully oversee the sales closing activity, including proper accounting for HUD's sales proceeds.

Final Solicitation: R–OPC–22505 (Aug. 6.2003) ("Solicitation"), ¶ B.1. The contract awarded in this case is one of 24 similar contracts in four regions, identified by the headquarters or HUD Homeownership Center (HOC) location for each. This particular contract falls under the Atlanta HOC, and targets the real estate market for North Carolina and South Carolina, Area 4 of the Atlanta HOC. Solicitation at ¶ B.5.

We note that the Intervenor, HMBI, succeeded in winning several M & M contracts in other regions, at least one of which was the subject of another bid protest before this Court. *See Chapman Law Firm v. United States and HMBI,* 63 Fed.Cl. 25 (2004) (challenging HMBI's status as a small business.) That protest—litigated by two of the same attorneys involved in this action—had a tangential impact on this protest.

*Summary of Allegations*

PDM's objections to HMBI's selection have "evolved"—we use that term generously—between its original Government Accountability Office (GAO) protest and oral argument here, including brand new analysis

of one of its theories in PDM's last filing the weekend before the hearing. In the end, Plaintiff's bid protest falls under two general categories: (1) a challenge to the competitive range determination and subsequent award decision; and (2) objections to what PDM perceives as changes in the procurement or, alternatively, modifications to contract requirements, specifically as respects bonding and subcontractor participation. We discuss next the evaluation context for the first of these claims. Those facts pertinent to the discussion of the second category—changes in the procurement—are addressed in the Discussion.

Plaintiff initially asserted that HUD failed to follow the stated evaluation criteria by favoring price over technical merit in making the award to HMBI. This argument, which is present in the Complaint but only addressed in general terms in the "conclusion" of Plaintiff's opening brief, has essentially been abandoned by PDM.

As far as we can tell, PDM litigated each of these theories, and others, before the GAO. PDM filed its claim in this Court only after being notified that the GAO had rejected its bid protest. We, of course, review the allegations *de novo*. PDM's claim of error in including HMBI in the competitive range requires that we now set forth the evaluation scheme for this procurement.

*Evaluation Criteria: Technical Merit and Cost*

The Request for Procurement ("RFP") called for a "best value" competition, providing for two-part proposals: (1) the Technical and Management Proposal; and (2) the Business Proposal. The Technical and Management Proposal was evaluated on the following criteria: Management Plan Capability/Quality of Proposed Management Plan; Past Performance; Prior Experience; Proposed Key Personnel; Subcontract Management; and Small Business Subcontracting Participation. Part II, the Business Proposal, is essentially the price at which the offeror is able to provide the services. Solicitation, Section M (Evaluation Factors for Award.)

According to the Solicitation, in Section M, "Evaluation Factors for Award": "The com-

bined relative merit of the Offeror's technical proposal ... shall be considered significantly more important than price. While the proposed price will not be assigned a specific weight, it shall be considered a significant criterion in the overall evaluation of proposals." Solicitation at ¶ M.1; *see also* Acquisition/Source Selection Plan at ¶¶ 5.3, 5.4. Notwithstanding the Solicitation's emphasis on technical merit, HUD clearly indicated that the agency would award contracts to those offerors whose proposals represent the "best overall value to the Government." The agency described the trade-off between technical merit and price as follows:

> The Offerors' total evaluated price will be traded off against the Offerors' technical (non-price) portion of the proposal, to determine the overall best value to the Government. The best value is represented by the most advantageous offer, price and other factors considered. Such offer may not necessarily be the proposal offering the lowest price or receiving the highest technical rating.

Solicitation at ¶ M.6. Although PDM initially indicated challenges to HUD's trade-off procedures, throughout briefing of the Motions for Judgment on the Administrative Record, Plaintiff has offered no more than the general allegations contained in its Complaint.

*Rating of Proposals*

Pursuant to the "Evaluation Process" outlined in Section 5 of the Acquisition/Source Selection Plan, each proposal was evaluated for its responsiveness to the technical criteria outlined above, and received one of the following ratings for each sub-factor: Excellent; Good; Fair; Poor; or Unsatisfactory. Acquisition/Source Selection Plan, ¶ 5.4 and accompanying charts (collectively, "Evaluation Plan.") The subfactor ratings were subsequently combined into an overall rating for the technical evaluation factors as a whole, utilizing the same scoring methodology.

Those scores, as described by the Source Selection Plan, are:

- *Excellent:* The Offeror demonstrated the likelihood of exceeding Government expectations for the performance of the

contract at no risk or very low risk. The Offeror has not received any "unsatisfactory" or "poor" factor ratings.

- *Good:* The Offeror demonstrated a reasonable likelihood of meeting Government expectations for the performance of the contract. The Offeror has not received any "unsatisfactory" ratings. The proposal has low risk.

- *Fair:* The Offeror demonstrated that the Offeror may have trouble meeting Government expectations for the performance of the contract and/or the proposal has moderate risk. The Offeror has not received any "unsatisfactory" ratings.

- *Poor:* The Offeror demonstrated that the Offeror may have significant risk in meeting Government expectations for the performance of the contract or the proposal contains some high risks.

- *Unsatisfactory:* The Offeror demonstrated that the Offeror has unacceptably high risk and extreme doubt exists that the Offeror will successfully perform the required effort even with exceptional contract emphasis and very close Government monitoring.

Acquisition/ Source Selection Plan, "Evaluation Plan," AR Tab 1 at 29. One of three recommendations, along with appropriate explanation, results from these ratings. The proposal is considered to be: Technically acceptable; Technically unacceptable but capable of being made acceptable through clarification and oral or written discussions; or Technically unacceptable and should not be considered further. In each case, principal weaknesses and deficiencies to be addressed during oral or written discussions are identified. *Id.*

In addition to these substantive ratings, each proposal is assigned an overall risk assessment based on the offeror's likelihood of success in performing the requirements of the Solicitation. The spectrum of risk ratings is: Very Low; Low; Moderate; High; and Unsatisfactory. These evaluations are defined in Section 6 of the Source Selection Plan:

- *Very Low:* No doubt exists that the Offeror will successfully perform the required effort. Normal Contractor effort and normal Government monitoring will probably minimize any difficulties.

- *Low:* Little doubt exists that the Offeror will successfully perform required effort. Regular Contractor effort and regular Government monitoring will probably minimize any difficulties.

- *Moderate:* Some doubt exists that the Offeror will successfully perform required effort. Special Contractor emphasis and close Government monitoring may be able to overcome difficulties.

- *High:* Substantial doubt exists that the Offeror will successfully perform required effort. Exceptional Contractor emphasis and close Government monitoring would not minimize difficulties.

- *Unsatisfactory:* Extreme doubt exists that the Offeror will successfully perform required effort even with exceptional Contractor emphasis and close Government monitoring.

Acquisition/ Source Selection Plan, ¶ 6.0(b).

The proposals were evaluated initially by one of four Technical Evaluation Teams (TETs). Use of these teams permitted a division of workload, a vetting process in the event the agency received a large number of proposals. Each team reviewed the proposals for a predetermined HOC and made preliminary ratings.

The teams were made up of HUD managers and technical staff members. There were five individuals per team. The head of each TET was also a voting member of the Technical Evaluation Panel (TEP or Panel), the body directly responsible for making procurement recommendations to the contracting officer. The Panel was made up of all TET members, only five of whom held a vote in determining the proposal's final rating. These votes were exercised by the four TET chairs and the TEP chair, the Director of the Atlanta HOC.

Therefore, only five members on the TEP ultimately advise the contracting officer on all proposals submitted in response to the RFP. They did so, in large part, through a

"consensus rating" which was arrived at by the Panel after meeting to discuss the preliminary findings of the various TETs. Acquisition/Source Selection Plan, Section 5.0. Although it had a continuing role in the procurement, at this early stage in the selection process the Panel's primary responsibilities were to develop the consensus rating, determine the technical acceptability of the proposals, and make recommendations to the contracting officer concerning the competitive range. *Id.*

Eight proposals were evaluated for the Atlanta HOC, Area 4 contract at issue here. The TET members independently read and evaluated each proposal and then reported their collective findings in memorandum form to the Chair of the TEP. *See* Memorandum for Chair, Technical Evaluation Panel, from Atlanta Technical Evaluation Team ("TET Report.") The TET found only two of the proposals "technically acceptable," the Plaintiff's proposal and that of Ten Management Carolina (TMC). Each received a *deliberation rating* of "Good" and a risk assessment of "Low." *Id.* The Intervenor's proposal, on the other hand, was deemed "technically unacceptable, but capable of being made acceptable through discussions" by the TET, which recommended only a score of "Fair" with a "Moderate" risk assessment for HMBI. *Id.* Of the remaining five offerors, two others were considered "technically unacceptable, but capable of being made acceptable through discussions," one with a "Fair/Moderate Risk" score and another with "Fair/High Risk." The final two were judged "unacceptable" with ratings of "Poor/High Risk" and "Unsatisfactory/Unsatisfactory." *Id.*

Subsequently, the TEP issued a similar but much more detailed 125–page memorandum to the contracting officer and Source Selection Authority designated for this procurement. By contrast, the entire TET Report was less than 30 pages. *See* Initial Technical Evaluation Panel Report, Contract Area A 4 ("Initial TEP Report.") The Panel's report rated three offerors—PDM, TMC and HMBI—"Good" with a "Low" risk factor. *Id.* It adjusted the TET's "Fair" *deliberation rating* of HMBI to a *consensus rat-*ing of "Good," and likewise improved HMBI's risk assessment from "Moderate" to "Low." The "acceptability" of the proposal was upgraded from "technically unacceptable, but capable of being made acceptable through discussions" to "technically acceptable." *Id.* The TEP did not adjust the scores of any other offerors, at least not at this "initial report" stage. PDM challenges the TEP's upgrading of the TET's evaluation of HMBI as improper. Absent this improper upgrading, PDM claims HMBI would not have been included within the competitive range, which ultimately resulted in its selection as winning bidder.

*Competitive Range Determination*

The Source Selection Plan explicitly permitted "the contracting officer to limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals." Acquisition/Source Selection Plan at ¶ 5.2. Beyond this, there is no specific standard controlling the contracting officer's discretion in deciding where to draw the line. Furthermore, "[w]hile the source selection authorities may use reports and analyses prepared by others, the source selection decision shall represent the source selection authorities' independent judgment." Acquisition/Source Selection Plan at ¶ 5.3 ("Source Selection Decision.") Thus the competitive range decision falls within the considerable discretion of the contracting officer. Nonetheless, it is quite apparent that as a practical matter, the contracting officer relies heavily on the TEP's recommendation.

Thus it was that HMBI's proposal was considered among those offers within the competitive range. Out of the eight rated proposals, three-PDM, HMBI and TMC-entered the next stage of the selection process, each with a consensus rating of "Good" and a risk assessment of "Low." On March 12, 2004, the contracting officer found "the proposals submitted by HMBI, TMC, and PDM are considered to be the most highly rated, have a reasonable expectation for award in this area, and should be included in the competitive range." Memorandum of Brenda Y. Thomas, Contracting Officer, Competitive Range Determination (Mar. 12, 2004) at 4–5.

She then proceeded to document her extensive rationale for this decision, summarizing the strengths and weaknesses of the top three proposals. PDM contends-without substantiation-that without HMBI's improved rating from the TEP, the competitive range would necessarily have included only PDM and TMC as the only Good/Low/Acceptable bids.

Although the three proposals were deemed technically acceptable, the TEP had identified a number of areas for further discussion for each. In light of its close association with Best Assets as a subcontractor, the contracting officer directed HMBI to respond to questions concerning its plans to incorporate small business subcontractors. *See* Letter of Brenda Thomas, Subject: Written Negotiations and Request for Final Proposal Revisions (March 15, 2004) at 3. In particular, the company was asked to confirm that its subcontractor management plan limited total subcontractor dollars to under 50% as required by the RFP. The company responded to these inquiries and addressed other identified weaknesses in its Final Proposal Revision. HMBI specifically reaffirmed that Best Assets subcontractor fees would be less than 50%, as required. Final Proposal Revision, HMBI (March 28, 2004.) Plaintiff similarly desponded to the weaknesses identified in its proposal. Final Proposal Revision, PDM (Apr. 1, 2004.)

*Selection of HMBI*

The role of the TEP, which will come under scrutiny in view of Plaintiff's challenges, continued well into the final stages of the selection process. After its initial report with the consensus rating—and after the competitive range was determined and further discussions were held with each offeror in the competitive range—the TEP Chair presented a Report entitled Final Technical Evaluation Report And Source Selection Recommendation Tradeoff Process ("TEP Final Report"). At this stage, the Panel recommended to the contracting officer the proposal that represented the best overall value to the Government.

In this final report, the TEP raised PDM's score, just as it had earlier adjusted the TET's evaluation of HMBI. The final rating of PDM was "Excellent" with a "Very Low" risk factor. TEP Final Report at 2. The proposals of HMBI and TMC remained the same, "Good" and "Low" risk. *Id.*

After discussions, final evaluated prices for each of the proposals were established. The technical merit and risk factors for each proposal were weighed against the cost of each. The offerors proposals were evaluated against each other and against an independent government cost estimate ("ICGE.") This figure "was based on historical data and market research of like services, and was also considered to be the Government objective." Price Negotiation Memorandum, Brenda Y. Thomas, Contracting Officer (April 15, 2004) at 5. Only one offeror-HMBI-was capable of performing the contract for less than the ICGE of $66,009,394. *See id.,* at 2–5. Plaintiff's proposal exceeded this figure by $11 million. Source Selection Authority Memorandum, AR. Tab 39 at 1898.

Although PDM was rated highest for its technical/management, HUD chose HMBI because its total price ($60,417,550) was almost $15 million less—about a 24% savings over PDM's offer. In the agency's letter informing PDM of its decision the contracting officer clearly states her rationale:

> The source selection decision was based upon a comparative assessment of proposals against all evaluation factors stated in the solicitation. PDM was rated Excellent overall and was technically superior to HMBI, who was rated Good overall. However, the difference in risk and technical ability between HMBI and PDM is not significant enough to justify the difference in cost of approximately fifteen million dollars ($15M). Therefore, HMBI proposal was determined to offer the overall best value to the HUD.

Letter of Brenda Y. Thomas, Contracting Officer to Marla Webb, PDM (July 9, 2004) at 3.

## DISCUSSION

### A. Applicable Legal Standards

Our jurisdiction over bid protests is based upon the Tucker Act, 28 U.S.C. § 1491(b)(1) (2004). Pursuant to § 1491(b)(1), a procur-

ing agency's decision is reviewed under those standards set forth in the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) ("APA"). The scope of review, as defined by the APA, is narrow. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). We accord the agency deference, only setting aside an action or decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Fru–Con Constr. Co., Inc. v. United States,* 57 Fed.Cl. 483, 485 (2003). This analysis considers whether: "(1) there was subjective bad faith on the part of procurement officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated." *Metric Sys. Corp. v. United States,* 42 Fed.Cl. 306, 310 (1998) (citing *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974)).

The Court of Appeals for the Federal Circuit recently reiterated the standards that apply to bid protests. *See Banknote Corp. of America v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004). In alleging error, the Plaintiff must do more than identify circumstances where the procuring agency made a mistake; it must establish that such a mistake was so excessive as to fall outside the decision-maker's ambit of discretion. In other words, Plaintiff must persuade us "that there was no rational basis for the agency's determinations." *Id.* at 1351 (quoting *Impresa Construzioni v. United States,* 238 F.3d 1324, 1332–33 (Fed.Cir.2001)); *see also Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). In this particular case, the burden is especially high because we are asked to overturn an award in a "best-value" procurement. 48 C.F.R. § 15.605(c) (2005) ("Federal Acquisition Regulation," or "FAR"); *TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327–28 (Fed. Cir.1996); *accord, E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996).

Additionally, when challenging the procurement on the basis of a regulatory violation, the protestor "must show a clear and prejudicial violation of [the] applicable statutes and regulations." *Banknote,* 365 F.3d at 1351 (quoting *Impresa,* 238 F.3d at 1333; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed.Cir.2000)). To establish prejudice on this ground requires the protestor to show that there was a "substantial chance" it would have been awarded the contract absent the alleged violation. *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999). Indeed, the Court of Appeals has directed us to address the prejudice issue first in bid protests, thus elevating the requirement to one of standing. *See Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.").

This case is before us on cross-motions for judgment on the administrative record, pursuant to RCFC 56.1. The facts upon which we rely are found exclusively in the administrative record of the procurement, which include any matters developed and considered by the agency in making its decision. *Aero Corp. v. United States,* 38 Fed. Cl. 408, 410 (1997). The administrative record as proffered by the Government may also be "supplemented" under tightly controlled circumstances, as we discuss shortly when we consider PDM's post-award issues. As with any administrative review under the APA, we limit our inquiry to "whether the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment." *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814 (citations omitted).

**B. Competitive Range Determination/Award Decision**

We turn first to what PDM describes as the "fundamental problem with the Government's award decision"—the inclusion of HMBI in the competitive range. Pl. Br. at 14.

PDM's Complaint takes aim ultimately at the competency of its competitor (technical merit) and HMBI's ability to manage the workload associated with the award of two M & M contracts (risk factor). Yet the focus of Plaintiff's brief is not to argue di-

rectly the relative technical merit or performance risk assessments of the proposals. Rather, Plaintiff attempts to make the case that the TEP in raising the Intervenor's technical rating arbitrarily and without specific justification discarded the TET's findings concerning HMBI's proposal.

Thus we concentrate on the narrow issue presented by the TEP's decision to upgrade HMBI, and examine the consequences that flowed from that decision. During oral argument, Plaintiff backed down from some of the weaker arguments contained in its papers. Counsel conceded that subsequent decisions of the contracting officer, especially in determining "best value," are not vulnerable to attack given the level of deference accorded her determinations. We appreciate counsel's candor at argument, as this discourse greatly assisted the Court in properly evaluating the Plaintiff's argument.

It is apparent that the upgraded ranking by the TEP had important consequences for HMBI and for Plaintiff. Counsel argued the obvious—that the Good/Low Risk score breathed new life into HMBI's bid—that it got HMBI to the next stage in the procurement, at which point HMBI's pricing separated its proposal from the pack.

The argument has some appeal in its $1+2=3$ logic. HMBI's proposal was initially rated Fair/Moderate Risk by the TET. Only two proposals, Plaintiff's and another's, were initially rated Good/Low Risk by the TET. Later the TEP upgraded HMBI to Good/Low Risk. When the competitive range was determined it included only offerors rated Good/Low Risk. Therefore, goes Plaintiff's thesis, had the TEP not revised HMBI's original rating in favor of a higher rating, HMBI would never had been included in the competitive range and thus not selected for the award.

Plaintiff's contention oversimplifies the procurement process. It relies on any number of logical leaps that are not borne out by the administrative record: the assumption that the TEP is bound by the TET's findings; the supposition that the TEP disregarded the TET's findings; and the false premise that the contracting officer's benchmark would necessarily have precluded consideration of any proposal rated below Good/Low Risk had there only been two offerors with that rating. Counsel failed to establish any of these necessary elements, and so failed to demonstrate a putative procurement issue, notwithstanding the deference factor.

*(1.) The TET's Role vis-a-vis the TEP's Rating*

The initial premise for PDM's theory is that HMBI's proposal was not properly considered "among the most highly rated proposals" because the initial rating of HMBI by the TET was only "Fair" with a "Moderate" risk factor. Absent further explanation the initial rating of the TET should stand. But the fact remains that HMBI's rating was changed upon further evaluation by the TEP. And by the time the competitive range determinations were made, the HMBI proposal had earned a consensus rating equivalent to that of the two other highest rated offerors. At its most extreme interpretation, PDM's argument tries to make the case that the TET's rating is binding on subsequent reviews. But even counsel admits that is not the case. Tr. at 12. The better argument is that TET's evaluations should carry some influence over TEP's decisions, lest the former be rendered irrelevant in purpose. And if the Panel deviates from the Team's findings they should explain why they have done so.

We find nothing in the administrative record that limits the TEP's consideration of proposals to those findings set out in the evaluation team's report. The agency's evaluation scheme simply provides that "[t]he TEP shall meet to discuss the findings presented by the TET." Acquisition/Source Selection Plan at ¶ 5.2. And "[b]ased on the findings presented, the TEP will develop a consensus rating, determine technical acceptability or technical unacceptability of the proposals, and make a recommendation to the [contracting officer] for the competitive range." *Id.*

From this, we conclude that the TEP responsibility is to consider the findings of the TET, but that the development of its consensus rating—in this case Good/Low Risk—is

arrived at independently by the voting members of the Panel. The Evaluation Plan confirms this interpretation. The TET's report, addressed to the TEP, assigns a "deliberation rating;" the TEP's report, addressed to the contracting officer, assigns a "consensus rating," and is followed by extensive justification for that rating.

We cannot fault the TEP for doing its own homework and coming up with a different rating than one of its teams. It would not be the first time a procurement official has discounted the evaluations of those under her. *See, e.g., EP Prods., Inc. v. United States*, 63 Fed.Cl. 220, 226 (2005) (contracting officer rated proposal lower than individual evaluation team scores). To do so is not arbitrary and capricious under circumstances where "the evaluation team's ratings [are] not determinative." *Id.* The Panel, not the Team, "was responsible for assigning a final rating," and the "Plaintiff has not demonstrated that the [TEP's] findings are unsupported by the administrative record or inconsistent with the evaluation criteria." *Id.*

The Source Selection Plan contemplates that the TEP will meet and discuss the TET evaluations for each proposal. There is no evidence that the TEP ignored the TET's evaluation. To the contrary, the Panel's initial report states at the outset that "[t]he TEP as a whole, reviewed the TET findings and determined the consensus ratings and technical acceptability of each proposal." Initial TEP Report at 1.

The opening paragraphs of the TEP Initial Report confirm that each Panel member also independently evaluated all proposals, a fact PDM denies without offering any support. The resulting analysis by the Panel is, not surprisingly, much more thorough than the preliminary evaluation performed by the TET. For instance, the TEP Report expounded upon strengths and weaknesses of HMBI's proposal that were touched upon only briefly in the TET Report. It also made explicit reference to a number of positive factors that had apparently not been considered by the TET, or at least had not been addressed in the Team's report to the Panel. While the TET noted three broad areas of weakness and five items for clarifica-tion, the Panel identified several strengths and weaknesses for each of the six subfactors and itemized 21 matters to be explored in later discussions. Whether correct or incorrect, it is quite evident that the TEP's recommendations, and its Good/Low risk rating of HMBI, resulted from an exhaustively detailed review of the relative merits of each proposal.

The Panel's initial report dedicates a full 24 pages to a discussion of HMBI's proposal. By comparison, the TET's report to the Panel covered HMBI's proposal in a mere 3½ pages. Plaintiff has not contended that any of the specific findings are in error. Rather, it merely complains that they are different *without making any explicit comparison.* The explanation for the differing analyses is implicit in the in-depth critical evaluation of the proposal itself. To prevail, the Plaintiff must show that the Panel's analysis was defective, or that the TEP's conclusions could not be justified by any reasonable interpretation of the facts. The Plaintiff did not even try to do so. Counsel admitted that "given the standard in this Court ... it would be almost impossible for [him] to second-guess" the ratings themselves. Tr. at 24–25.

In order for this Court to disturb those ratings, we must find that there is no rational basis for the TEP's findings. *Baird Corp.*, 1 Cl.Ct. at 664; *Cincom Sys. v. United States*, 37 Fed.Cl. 663, 672 (1997). As we have explained, the TEP was not bound by the TET's findings. Likewise, we find no support in the language of the Source Selection Plan, or anywhere else in the administrative record, obligating the Panel to articulate a justification for any divergence from the Team's findings.

Finally, Plaintiff's contention that TEP's upgrade of HMBI's rating is "unexplained"— and that the new rating is, therefore, arbitrary and capricious—is directly refuted by the evidence. The TEP's consensus rating for HMBI was adequately documented and supported by the administrative record. Finding ample support for HUD's decision within the administrative record ends the inquiry.

*(2.) Contracting Officer's Discretion in Determining Competitive Range*

■ PDM's final effort to establish error in the award process is to claim that HMBI would not have been included in the competitive range if the TET ratings had held, and that consequently it was an error to include it in the competitive range. A protestor carries a heavy burden in establishing that an agency improperly included an offeror in the competitive range for award of a contract. Here the contracting officer exercised her prerogative under the Source Selection Plan to limit the competitive range "to the greatest number that will permit an efficient competition among the most highly rated proposals." Acquisition/Source Selection Plan at ¶ 5.2.

Plaintiff would persuade us that there is no rational basis for the decision. We have carefully read the competitive range determination, an 8–page detailed description of all the strengths, weaknesses and risks of each of the eight offerors considered for award. While the contracting officer made explicit reference to the TEP's ratings, she also supplied a rational basis, independent of those scores, for her decision to include HMBI for further consideration for award. After dedicating a full-page summary of HMBI's proposal, the determination concluded: "Based on these facts, the Contracting Officer finds that [HMBI] is one of the most highly rated offerors, has a reasonable expectation of being selected for award in this area, and should, be included in the competitive range for this area A4." Memorandum of Brenda Y. Thomas, Contracting Officer, dated March 12, 2004 ("Competitive Range Determination") at 5. There is nothing in the document to suggest that the contracting officer abused her considerable discretion. *Hydro Eng'g v. United States,* 37 Fed.Cl. 448, 467 (1997) (refused to disturb contracting officer's determination, noting that "[t]echnical ratings are aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess.")

### C. Content of the Administrative Record

We turn next to those of Plaintiff's claims that depend, at least originally, on facts outside the administrative record and post-dating the award decision; that is, the subcontractor and bonding issues. The Government filed a three-volume submission of documents pertaining to this procurement, proffered as the exclusive record in this case. Plaintiff's papers rely on matters not contained in this submission.

Pursuant to RCFC 56.1, a party may supplement the administrative record only by stipulation or by order of this Court. There being no agreement by Defendant or Intervenor to PDM's extra-record evidence, PDM has moved to supplement the record with: (1) an electronic mail message purporting to show that HUD has permitted HMBI to post only a portion of the agreed upon payment and performance bonds; and (2) information allegedly taken from HMBI's website respecting its recruiting activity and purportedly showing that no properties had been listed after the time for performance had commenced.

Plaintiff's initial effort to support supplementation consisted of two pages of boilerplate conclusory arguments and a block quote relating the exceptions to the general rule against consideration of evidence outside the record. *See Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989) (setting forth eight examples in which supplementation of the administrative record may be appropriate as the only means to ensure effective judicial review). Plaintiff neither applied the so-called *Esch* factors to its own case for supplementation, nor demonstrated why supplementation is necessary to preserve meaningful judicial review.

Essentially, PDM offers three grounds for supplementation: (1) to demonstrate the arbitrariness of the Government's actions; (2) to support PDM's case for injunctive relief by showing lack of harm to the Government; and, finally (3) to support its case on bonding requirement. The Plaintiff's reply brief supplies more clarity to its position and concentrates on the bonding question.

### D. HMBI's Ability to Perform

■ The first of PDM's grounds for supplementation is unpersuasive. The import of

Plaintiff's extra-record evidence is that HMBI is unqualified to perform the marketing services called for by the contract. *See, e.g.,* Pl. Br. at 24 ("HUD's award to HMBI ... failed to assess HMBI's proposal as a significant or high risk because of its financial position, size and lack of prior experience."). Instead of relying upon material the agency had before it to support this argument, Plaintiff sets forth information collected subsequent to the award of the contract. Specifically, PDM wishes to include in the record information from HMBI's website that purports to show it had not yet listed any properties pursuant to the HUD contract. PDM also cites post-award personnel activity at the company, described by Plaintiff as "a whole-sale recruiting effort in the Carolinas, led by its subcontractor Best Assets." Pl. Stmt. of Facts, ¶ 34.

Plaintiff provided no hard evidence of HMBI's recruiting, so we have no way of assessing the true magnitude of the company's hiring initiative, assuming it would be appropriate to do so. As for the alleged lack of property listings, Plaintiff has been proven dead wrong, or at least it would be proven wrong based on the Government's counter-proffer, were we to allow the Government also to engage in supplementing the record with extraneous information.

We refuse to consider any proffered information purporting to demonstrate HMBI's inability to perform the awarded contract, and not just because of its speculative quality and its lack of authentication. There is an even more fundamental flaw with this "evidence." Because the alleged personnel changes occurred after HUD's determination to award the contract, it necessarily follows that this activity played no role in the agency's decision-making process when it selected from the bids of various offerors. Therefore, whether personnel changes occurred has no probative value whatsoever in determining whether the award decision was arbitrary or capricious.

Plaintiff would have us extrapolate from these allegations that "whatever staff and organization originally proposed by HMBI and evaluated by HUD will bear no relationship to the staff with which HMBI intends to attempt contract performance." Pl. Stmt. of Facts, ¶ 34. Such conjecture, based upon events clearly post-dating the procurement award and likely falling in the realm of contract administration, has no place in the Court's resolution of this bid protest.

### E. Bonding Requirement

*(1.) Extra–Record Evidence:*

Among Plaintiff's complaints about this procurement is the assertion that after the award HUD relieved HMBI of certain special contract requirements in Section H of the Solicitation. The RFP called for annual payment and performance bonds, each in the amount of two percent of the contract price. Solicitation at ¶ H.11. Included with PDM's motion to supplement the administrative record is an electronic mail message of unknown origin and information from HMBI's website. The "e-mail" message states, in pertinent part:

> I have just completed a conference call with HUD staff concerning the bonding situation. HUD program and legal staff have agreed to accept 1/12th of the annual bond amount in cash. The funds have to be allocated to each contract area to conform with contract legal requirements.

Pl. Stmt. of Facts at Ex. 1. The message went on to list revised bond figures for the contract in question, Charlotte, and for contracts in two other regions, Chicago and Seattle. It concluded with the following statement: "In addition, we must draft a more comprehensive response as to why we have not secured the bonding. The explanation that was forwarded to them this afternoon is not detailed enough." *Id.*

*(2.) Relevance Established:*

There is no indication within the e-mail message or anywhere in Plaintiff's papers as to who authored the message or in what context it was delivered. Insofar as the e-mail suggests HMBI posted an insufficient bond, the evidence is irrelevant. We agree with the decision of the GAO that the *adequacy* of a contractor's payment and performance bonds is by definition a matter of contract administration.

*Portfolio Disposition Management Group, LLC,* B–293105.3; B–293105.11 (Oct. 25, 2004). Second, to the extent this information is intended to demonstrate HMBI's inability to carry out the contract, we reject consideration of the evidence altogether. Our review under the APA in bid protests is limited to whether there was a rational basis for the award decision. Evidence that the chosen contractor experiences problems in performing, subsequent to the award decision, does not render the procurement decision itself arbitrary and capricious.

There is a better case to be made, however, that the e-mail is needed in order to demonstrate that the agency violated procurement law by changing the requirements of the Solicitation. As Plaintiff asserts in its brief, an amendment to the Solicitation may trigger the duty to reenter into discussions with all offerors and permit all bidders the opportunity to modify their proposals accordingly. FAR § 15.206(a); *MVM, Inc. v. United States,* 46 Fed.Cl. 126, 131 (2000). Such is the case with major modifications—changes that could result in a substantially different proposal by those competing for the contract. *See AT & T Communications, Inc. v. Wiltel, Inc.,* 1 F.3d 1201, 1205 (Fed.Cir.1993) (new bids required only where modifications are outside the scope of original competed contract).

We may allow supplementation of the administrative record in limited circumstances where the record is insufficient for the Court to render a decision. *Impresa,* 238 F.3d at 1338–39. We have serious doubts whether the proffered e-mail meets the tests for supplementation since it is unauthenticated and obviously an incomplete record of a purported transaction. After probing this issue at oral argument, it became obvious that there is no means, absent supplementation of the record, by which to test Plaintiff's theory. Of course, we are reluctant to rely solely on an e-mail message that was turned up by a private investigator, purportedly after having been discarded in the trash. Therefore, were we to grant the Plaintiff's motion to supplement the record we would do so only in conjunction with the Government's prof-

fered supplemental documents which fully elucidated the so-called bond changes.

### (3.) Standing to Challenge Changes:

What seems a matter of contract administration may, in certain instances, be challenged by a disappointed bidder, sometimes long after contract performance has begun. PDM claims that HUD improperly relaxed bonding requirements after having conducted a competition based on the original requirements. According to Plaintiff, these actions and omissions changed the terms of the contract and required HUD to either amend the solicitation and permit PDM to make another bid, pursuant to FAR 15.206, or terminate the contract as a result of its out-of-scope modification.

 This Court has recognized the well-established principle that "the contract awarded must be the one for which the offerors have competed." *See Hunt Bldg. Co., Ltd. v. United States,* 61 Fed.Cl. 243, 277 (2004) (Court ruled that continued post-selection revisions rendered the competition underlying award decision illusory.). A modification in required performance may obligate the agency to re-open the competition when the modification materially departs from the scope of the original procurement. *AT & T,* 1 F.3d at 1205. In making this determination the Court considers: (1) whether the modification is of a nature which potential offerors would reasonably have anticipated; and (2) whether the modification substantially changes the type of work, performance period, and costs as between the original contract and the modified contract. *Cardinal Maint. Serv., Inc. v. United States,* 63 Fed.Cl. 98, 106 (2004) (citing factors identified by Comptroller General) (citations omitted.)

 Plaintiff cites several cases that illustrate so-called out-of-scope modifications. *See MVM, Inc. v. United States,* 46 Fed.Cl. 126 (2000) (contract for court security services reduced from nine judicial districts to eight; set aside for trial on whether change prejudiced protestor); *Cardinal Maint. Serv., Inc. v. United States,* 63 Fed.Cl. 98 (2004) (cumulative effect of eight modifications in the first year of contract perform-

ance amounting to 80% increased cost to government constituted cardinal change to the awarded contract); *but see, CESC Plaza Ltd. P'ship v. United States*, 52 Fed.Cl. 91, 93 (2002) (a 1.7% increase in rent, a figure less than allowable annual escalation, was not a material change in the contract).

There are several reasons to reject the claim concerning the "change" in the required bonds. First and foremost, PDM cannot make the requisite showing of prejudice and, therefore, cannot challenge the alleged procurement error. We determine prejudice as a threshold matter, prior to reaching the merits of an alleged procurement transgression. *See Info. Tech.*, 316 F.3d at 1319; *Banknote*, 365 F.3d at 1351. Here PDM must show that but for the alleged violation, there was a "substantial chance" that it would have received the Atlanta–4 contract. *Alfa Laval*, 175 F.3d at 1367; *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d ·1071, 1086 (Fed.Cir.2001).

To simply allege that the agency treated offerors unequally by the arrangement HUD entered into with HMBI is insufficient evidence of a "clear and prejudicial" violation. *Impresa*, 238 F.3d at 1333. Similarly, counsel's broad statement that obtaining the necessary bonding commitments "took a great deal of effort and resources, which resources could have been better utilized if PDM had known· that the bonding requirement would be relaxed," is inadequate to sustain its burden. *See* Pl. Reply at 16.

Nowhere in the papers are we led to believe PDM had a "substantial chance" of receiving this contract with a delay in posting the full bond. Plaintiff has not even suggested, much less demonstrated with competent evidence, that it would have significantly altered its bid and bettered its chances of award as a result of a similar accommodation. Indeed, such a claim would be futile. PDM's bid was not even close to HMDI's proposal—it exceeded HMDI's pricing by almost $15 million, or 24%. *See, e.g., Indus. Property Mgmt. Inc. v. United States*, 59 Fed.Cl. 318, 324 (2004) (held protestor had no substantial chance of award where its bid was 20% more costly than awardee with same technical rating). A downward adjust-

ment to reflect a lesser bond obligation clearly. would not have made Plaintiff's proposal more competitive. Of course, that issue is not even before us—PDM never even attempted to carry its burden. Plaintiff's inability to establish prejudice is fatal to its APA burden and to its case for a procurement violation.

Once we permitted the Government's supplementation beyond the vague e-mail message PDM supplied, the *circumstances* became very clear. The bond *amount* required by the Solicitation was not modified after the award. The contract requires HMBI to post payment and performance bonds equivalent to two percent each of the total contract price. These bonds were due before starting work, or by default, on October 1, 2004, the 61st day after performance was scheduled to begin. Solicitation at ¶ H.11. Although Plaintiff's exhibit, the e-mail to HMBI, appeared to reduce this bond significantly to 1/12th of that amount, the agency's additional evidence demonstrates that HUD merely permitted a lesser bond as a temporary measure, necessitated by the bonding impact covered by a bid protest related to another of HUD's M & M contracts with HMBI. CSUF 46. The agency demanded that HMBI provide 1/12th of the bond in cash on October 1st. It further required of HMBI an extensive justification for its delay along with assurances of its ability to provide the remainder of the bond before the end of the month.

On October 28, 2004, HMBI satisfied the bond requirement as evidenced by an irrevocable letter of credit from Bank of America in the amount of $292,544. In fact, contrary to Plaintiff's assertions—which have understandably evolved in light of more complete information—HMBI posted an amount in excess of that which was actually required, apparently without realizing it. Although it indicated merely that it was meeting "our Two Per–Cent (2%) bond requirement," the amount posted by HMBI accounted for more than the full bond amount for both the 2% performance bond and the 2% payment bond. Def. Opp. at Ex. 3.

We conclude, therefore, that HUD did not "relax" the bond requirement. At no point did HMBI violate the contract. Its request

and all other transactions concerning HUD's acceptance of HMBI's terms for complying with the bonding requirément predated the due date for the bond. At most, HUD allowed a reasonable extension of less than a month within which to post the required bond. This possible eventuality was anticipated by the agency when it issued *pre-award* amendments to the RFP. *See* Cause H.11, Tab 8 at 382 (providing that bonds are due on the 61st day after contract award "unless otherwise extended by the Contracting Officer"). We believe that an extension expressly provided for in the solicitation materials is by definition "within scope." *Cf. CW Gov't Travel, Inc. v. United States,* 61 Fed.Cl. 559, 574 (2004) (positing that a "modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause").

### F. Subcontractor Limitation

In the cover letter for this Solicitation "[HUD] encouraged businesses to pursue various types of teaming arrangements and subcontracting opportunities." Nonetheless, the contract also provided that subcontractor performance could not exceed 50% of the total cost. In the same vein as the bonding argument, Plaintiff faults HUD for failing to enforce this prohibition against HMBI.

By permitting HMBI to avoid this limitation, according to PDM, HUD gave the company an unfair advantage over the rest of the offerors. Specifically, HMBI was able to bootstrap its relatively lacking past performance with that of Best Assets, the incumbent subcontractor with whom HMBI associated for this procurement. *See* Solicitation at ¶ M.5 (3) (Technical and Management Proposal—Prior Experience) ("The Offeror shall provide evidence of its experience as an organization or the experience of its major subcontract partners, in performing work and providing, during the past five (5) years, deliverables the same as, or similar to the primary services required in the solicitation.".)

Indeed, because the RFP contemplated performance primarily by a small business concern, the contract limited the permissible level of the offerors' reliance on subcontractors. For this reason, the Solicitation required proposals to itemize the total value of the proposed small business subcontracting effort as it related to the total value of the prospective contract, to state specific goals for small business, to indicate small business commitments, and to describe the substantive nature of work to be subcontracted. *See* Solicitation at ¶¶ M.5(5)-(6) (Technical and Management Proposal; discussion of Subcontractor Management and Small Business Subcontracting Participation.) If it could be shown that HUD disregarded this clear goal in accepting HMBI's offer, then we might well have a cardinal change.

The problem with this theory is that it is based on little more than sheer speculation. Plaintiff relied on some of that very evidence relating to personnel recruitment and staffing that we rejected as supplementation.

Recognizing this fatal weakness in its case, Plaintiff switched theories in its reply brief. It now raised a new argument based not on post-award evidence, but on an alleged inadequate analysis of HMBI's proposal. We ruled this out of order as a violation of our Special Procedures Order which forbids raising new matter in a reply. The transgression was especially egregious in this case. The reply was due no later than close of business, Friday, with argument the following Tuesday. Under this compressed schedule, adopted as an accommodation to the Plaintiff, there was no practical opportunity for the other parties, or the Court, to respond in adequate fashion.

Plaintiff's last ditch argument is so lacking in substance that we are tempted to critique it at far greater length than it deserves. Suffice it to say that it attempts to show that the agency's analysis of HMBI's relations with Best Assets was faulty in light of counsel's analysis. The very premise of this attempted critique is patently false. In a bid protest, we do not reject the contracting officer's discretion and expertise in favor of our own or even that of Plaintiff's counsel.

Finally, we note that Government's counsel, although not required to respond at oral argument, did a very credible job on short

notice of rebutting counsel's assertions. We commend the transcript to anyone wishing more detail. The requirements of the solicitation were never changed. Nor was HMBI relieved of fulfilling the requirements. The type of work contemplated, the time for performance of those services, and the costs for those services all remained the same. The original contract as modified calls for "essentially the same performance." *Executive Bus. Media, Inc. v. United States Dep't of Defense*, 3 F.3d 759, 763 n. 3 (Fed.Cir.1993).

### CONCLUSION

We reject Plaintiff's claims that HUD has erred in its selection process, changed the solicitation's requirements, or permitted out-of-scope modifications of the awarded contract. **Accordingly, we GRANT the Defendant's Motion for Judgment on the Administrative Record and DENY the Plaintiff's cross motion. Plaintiff's Motion for Permanent Injunction is hereby DENIED.**

The Clerk of the Court will enter judgment in favor of the Defendant, and dismiss the Plaintiff's Complaint. No costs.

**IT IS SO ORDERED.**