**B & S TRANSPORT, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 05–423C.

United States Court of Federal Claims.

Sept. 12, 2005.

Alani Golanski, Brooklyn, New York, attorney for plaintiff.

Sean M. Dunn, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## ORDER AND OPINION

HODGES, Judge.

B & S Transport filed an action in this court "seeking injunctive, declaratory and legal relief" from the Government's decision to award a contract to supply tires to the Army's Tank–Automotive & Armaments Command, or TACOM. The winning bidder was Tire Mart. Plaintiff claims that TACOM's award to Tire Mart was arbitrary and capricious in that it violated various terms of the solicitation, that it did not represent the best value to the Government, and that it "works an oppression upon the small, disadvantaged plaintiff." Plaintiff alleges that the Army's actions "constitute a breach of the implied contract of fair dealing concerning this procurement, an improper sanctioning of Tire Mart's violation of the Buy American Act notification requirements, and also a breach of the implied in fact preference of the small disadvantaged plaintiff business concern." B & S withdrew its request for a preliminary injunction during a hearing on August 25, and abandoned its Buy American Act arguments. It has not pursued the allegations of oppression based on plaintiff's disadvantaged status.[1]

Plaintiff has not shown that the Army acted arbitrarily, capriciously, or otherwise not in accordance with the law in connection with this procurement. *See* 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). The solicitation was not improper in any respect. We grant defendant's motion for judgment on the Administrative Record and dismiss plaintiff's Complaint.

## BACKGROUND

The Army issued a solicitation in September 2004 for 33,120 pneumatic tires to be

---

1. The Department of Defense had suspended its price evaluation adjustment for small disadvantaged businesses for 2004 because it exceeded its five percent goal for contract awards to such businesses, according to defendant. *See* 10 U.S.C. § 2323(a).

supplied over a three-year period beginning in January 2005. The Army restricted offers initially to Bridgestone/Firestone non-radial tires on the basis of lowest evaluated bid. Offers were to be submitted by October 7, 2004.

B & S certified that it was a small disadvantaged business concern that met the responsibility criteria established by applicable Federal Acquisition Regulations. *See* 48 C.F.R. § 9.104–1. These include representations that plaintiff had adequate financial resources to perform the contract within the proposed performance and delivery period, that it had a satisfactory performance record, and that it had a history of integrity and proper business ethics. *Id.*

According to B & S, Bridgestone/Firestone confirmed that it would furnish at least 15,-000 tires, "with expected additional quantities, in satisfaction of the contract." However, another bidder advised the Government that Bridgestone/Firestone tires were being discontinued and would not be available for the entire period of the contract. The Army confirmed this assertion by contacting Bridgestone/Firestone North American Tire Company. A memorandum from Bridgestone stated, "Bridgestone/Firestone has made the decision to discontinue supplying TBS tires in the United States and Canada at the end of 2006.... It is imperative that Bridgestone not enter into any new contracts that require us to supply bias-ply tires past 2006." The contract at issue in this case is to run through 2008.

The Army added two qualifying tires as approved substitutes because of the potential unavailability of Bridgestone tires. These were the Denman DEX 11 tire and the Specialty Super Transport. Revised best and final offers were scheduled for November 10, 2004. Army contracting officials found that the Denman tire was not on the Government's Cooperative Approved Tire List and amended its request to eliminate that tire.

TACOM stated that if a contractor "should offer a Bridgestone/Firestone tire or any other manufacturer's tire that may discontinue production ... you will be required to provide the alternate tire at the award price." The new deadline for best and final offers was November 17, 2004.

Plaintiff's president contacted the defendant before submitting a best and final offer and asked that the Army allow B & S to supply Bridgestone/Firestone tires "and then switch over to Specialty when Bridgestone discontinued production ...." He also asked that the other bidders not be permitted to use the same approach, according to Government officials. TACOM responded that "all offerors have to have the same 'level playing field.'" B & S denied the Government's suggestion that plaintiff sought preferential treatment. The basis for plaintiff's denial is not entirely clear, but neither party has argued that this issue is relevant to the bid protest by B & S.

B & S submitted two best and final offers on November 16—Specialty Tire's Super Transport for $182 per tire; and the $182 Specialty Tire with Bridgestone/Firestone tires as "a secondary source of supply in the event an order exceeds Specialty Tire's capacity." The eventual winning bidder, Tire Mart, offered Specialty's Super Transport for $178 per tire. Plaintiff bid $182 per tire, including the federal excise tax. Their bids net of the excise tax were $171.78 for B & S and $168.78 for Tire Mart.[2]

The Army amended its solicitation again on December 7 to expand the tire's description, then requested another series of best and final offers. The amended solicitation described the tire as follows: "Tire, Pneumatic, Size 10.00–20, Load Range Government, Bias, Tube–Type, w/Flap, Over the Road, Truck–Bus, Highway Regular Tread, I/A/W CATL 1922." B & S submitted a best and final offer on December 10. The bids of

---

**2.** Tire Mart offered to supply the Specialty Tire for $178, including federal excise taxes of $10.22 per tire. The contracting officer netted this amount out because the tax does not apply to tires used by the Department of Defense. *See* 26 U.S.C. § 4073. B & S' offer for Specialty Tires was $182, with Bridgestone/Firestone as a sec-

ondary source. Plaintiff did not specify whether its price included federal excise tax, so the Government did not adjust B & S' offering price as it did Tire Mart's. The bids net of taxes were $168.78 for Tire Mart and $171.78 for plaintiff B & S.

B & S and Tire Mart were the same, net of excise taxes—$171.78 and $168.78 respectively. The American Jobs Creation Act of 2004 exempts "tires sold for the exclusive use of the Department of Defense" from federal excise tax. *See* 26 U.S.C. § 4073.

A contract specialist with TACOM recommended that the Army award the contract to Tire Mart. Her December 2004 Award Abstract stated, "[t]his solicitation originally called for a Bridgestone/Firestone part number, however, Bridgestone/Firestone is discontinuing that tire and the solicitation was revised to CATL approved tires .... Tire Mart's unit price of $168.78 is determined fair and reasonable based on adequate competition." [3]

B & S protested the award on December 28, 2004, complaining that Bridgestone/Firestone would have furnished a minimum of 15,000 tires "with expected additional quantities." Further, it alleged that Specialty Tire did not have the capacity to meet the specified quantities as of bid closing. TACOM denied B & S' protest in January 2005, pointing out that plaintiff itself had proposed the Specialty tire: "[B & S's] own offer was to provide the Specialty Tire Super Transport. If we were to determine that our decision to include the Super Transport was improper, then we would have to disqualify not only the awardee's offer but your own as well."

## DISCUSSION

B & S alleges that only plaintiff had assembled an offer guaranteed to meet the contract's capacity requirements because it included both the Specialty tire and the Firestone tire that the Army had requested initially. Defendant's decision to award the

contract to Tire Mart was arbitrary and capricious because Specialty Tires of America "did not possess the present capacity to fulfill the contract's requirements." B & S charges that Tire Mart's bid did not account for its "improper substitution of the U.S.-made flaps originally inserted in Specialty's Tires with cheaper, non-certified, non-approved imported flaps ...."

Plaintiff warns that Tire Mart's flaps will "(1) pose an ultrahazard to personnel who would use the vehicles equipped with such tires; (2) enormously increase the real cost of the tires into which such flaps are incorporated; and (3) prevent the bid price from realistically reflecting the true, ultimate cost the Government would potentially sustain." Plaintiff also objects to the Army's award because

> the Tire Mart offer did not necessarily comport with the Buy American Act requirement set forth in the solicitation, and in any event, Tire Mart's failure to disclose, and the Government's failure to consider, Tire Mart's use of non-certified imported flaps precluded any assessment of whether Tire Mart's bid complied with the Buy American Act or the regulations implementing that Act; and the Army arbitrarily failed to conduct a best value analysis, which analysis would have resulted in an award of a contract to B & S ....

The Buy American Act applies to components that exceed fifty percent of the cost of the end product.[4] The flaps at issue here did not approach the fifty percent threshold, so the Buy American Act is not implicated. Plaintiff abandoned this argument during a hearing on August 25.

---

**3.** The Abstract also noted, "Tire Mart's current unit price represents an annualized increase of 1% since the last award in January 2002 .... Tire Mart, Inc. is determined responsible within the meaning of the FAR 9.104. Tire Mart, Inc. is not on the Debarred/Ineligible List as of 29 November '04 .... Based on the foregoing summary, approval of award is recommended to Tire Mart, Inc." Offers listed in the Abstract are: Tire Mart $167.78, B & S Transport $182, I & E Tire Corp. $180, and Onodi Tool $199, all offers being based on the full three years of the contract.

**4.** The Buy American Act generally limits the Government's purchase of supplies for public use in

the United States to domestic end products. *See* 41 U.S.C. §§ 10a–10d. Applicable statutes and regulations provide a number of exceptions, however, and wide latitude to procuring agencies. For example, the restrictions apply only to components that exceed fifty percent of the entire cost of a product. 48 C.F.R. § 25.101(a)(2). The Department of Defense defines "domestic end product" as one "manufactured in the United States if the cost of ... its components that are ... manufactured in the United States exceeds 50 percent of the cost of all its components." 48 C.F.R. § 252.225–7001(a)(2)(ii).

TACOM's final solicitation described the tire in detail, including the requirement that each tire include a flap.[5] The solicitation did not include specifications for the flap, however, or minimum standards. Plaintiff's counsel did not have information to support his allegations concerning "Tire Mart's use of non-approved flaps" that could create a hazard or otherwise cause the tires to be nonconforming. The Administrative Record does not show the source of the flaps proposed by Tire Mart, or that they were deficient or defective.

Plaintiff alleges that "the contracting officer and/or the contract specialist, along with other of defendant's agents and the Army's authorized representatives have demonstrated animosity, and not rationality, in their interactions with B & S' minority owner." Counsel offered a declaration from Mr. Harris stating that he felt that Army contract personnel expressed animosity toward him or B & S during a discussion after contract award.

Mr. Harris' declaration seems to base the allegations of animosity primarily on the fact that the Army did not award the contract to B & S. For example, he declared that "TACOM unfairly disqualified our bid, purporting to rely on speculation that Firestone might, at some unspecified future date discontinue production of its line of bias tires, the line required under the solicitation." The declaration added, "Tire Mart was able to lower its bid price only because it substituted cheaper, non-certified and non-approved component flaps that had been manufactured outside of the United States."[6]

The only reference in Mr. Harris' declaration to animosity follows:

> [T]he contract specialist, and other members of the Government's team participating in the procurement under the solicitation, have demonstrated animosity to me and to B & S. This has included their refusing to discuss in any helpful detail the basis of their decision making, refusing to offer a rational explanation for the award to Tire Mart, hanging up on me when I have tried to discuss these matters following TACOM's disqualification of B & S's original bid, and generally being unresponsive and unhelpful.

If animosity can be inferred from this declaration, and if these events occurred as alleged, they do not show that award of the contract to Tire Mart was the result of such animosity.

■ B & S could not support its impression that Government contract personnel had animus toward the company or its president, Mr. Harris. Government employees are presumed to have acted in good faith. *See, e.g., Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1330 (Fed.Cir.2004) (citing *Info. Tech. Applications Corp. v. United States,* 316 F.3d 1312, 1323 n. 2 (Fed.Cir. 2003)) (requiring especially high standards of proof to show bad faith by Government officials); *see also, Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982) (equating proof of bad faith "with evidence of some specific intent to injure the plaintiff."). Nothing appears in the Record or among plaintiff's arguments to suggest that these government employees did not act in good faith.[7]

---

5. "Tire, Pneumatic, Size 10.00–20, Load Range Government, Bias, Tube–Type, w/Flap, Over the Road, Truck–Bus, Highway Regular Tread, I/A/W CATL 1922" (emphasis added). Neither party explained what a "flap" is in this context. Evidently, its purpose is to protect the inner tube from the metal rim of the wheel.

6. As noted, B & S did not offer evidence or even allegations concerning the basis of its assumption that the flaps would be substandard if they were imported, or that they would create a danger of performance failure.

7. The only reference that we could find in the Administrative Record to an encounter among

Mr. Harris and TACOM's contracting officers is a November 16, 2004 email from Catherine Ham stating, "Tony, Matt and I had a lengthy conversation with Ronnie Harris and the final conclusion was that he is going to submit his 'best and final offer' letter by close of business tomorrow. It took us an hour and forty minutes to reach that decision. What he really wanted was for us to cancel the best and final offer letters and only allow him to supply Bridgestone/Firestone tires and then switch over to Specialty when Bridgestone discontinued production, however, he didn't want any of the other offerors to have the advantage of offering the Specialty tire. We reminded him that all offerors have to have the same 'level playing field.'"

Plaintiff argues that "the ultimate difference in offering price as between B & S and Tire Mart is not ample enough to render academic other best value considerations." It also urges the court to consider that "the Government's failure to even inquire about the possible ramifications of a flap substitution indicates that its overall approach to the instant contract award was less than rational, and short-sighted in its approach to the best value assessment." This was not a best value contract, however. *See* 48 C.F.R. § 15.101–1 (providing standards for a "tradeoff" or best value procurement). Best value awards allow the Government to accept other than the lowest priced proposal where the perceived benefits of the higher priced proposal merit the additional costs. 48 C.F.R. § 15.101–1(c). TACOM awarded this contract according to the lowest evaluated bid. *See* 10 U.S.C. § 2305.

> The December 15, 2004 solicitation states, [t]he Government intends to evaluate offers and award a contract without discussions with offerors. Therefore, the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint. However, the Government reserves the right to conduct discussions if later determined by the contracting officer to be necessary. The Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers received.

*See Galen Med. Assocs. v. United States,* 369 F.3d 1324, 1330 (noting "[t]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious.")

(quoting *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980)).

Plaintiff complains that, "[a]t the very least, a rational decision maker would have deemed the structure of the B & S offer, demonstrating a guaranteed back-up buffer of a minimum of 15,000 tires—approximately half the entire contract estimate—to more than overcome the three-dollar disparity in offering prices as between B & S and Tire Mart." [8] This was not a best value contract; defendant chose Tire Mart because of the three-dollar disparity. The contract calls for delivery of 33,120 tires over a three-year period.

## CONCLUSION

Plaintiff did not show that the Army acted arbitrarily or capriciously, or otherwise not in accordance with the law. One who seeks the court's interference with an agency's procurement process has a high burden. *See, e.g., Portfolio Disposition Mgmt. Group v. United States,* 64 Fed.Cl. 1 (2005) (discussing *Banknote Corp. of America v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004)).

TACOM's solicitation was not improper in any respect. The Contracting Officer weighed the Army's pressing need for quality tires from reliable sources for use in combat operations, and made adjustments as required or as appropriate. The Administrative Record shows that contracting personnel made reasoned decisions throughout the procurement process.

Plaintiff's counsel withdrew B & S' petition for an injunction during the August 25 hearing.[9] We have not considered or discussed

---

8. The Government asked plaintiff to show that the Bridgestone tire would be produced through 2008, but B & S has not provided such documentation.

An email from Bridgestone/Firestone management in September 2004 reached TACOM contracting personnel in November. The message from Bridgestone states, "we are discontinuing bias production in 2006 ... but have significantly reduced our production as we phase out of contracts with these products. Our plan is to continue that downward trend. Due to this fact, we are approving no new contracts on bias-ply products, regardless of the quantity or duration of contract .... We cannot in any way support a

TACOM request on any bias-ply product, nor will we be in the future."

The in-house email message that forwarded the email from Bridgestone's management to the contract specialist at TACOM includes the following: "This says it all and is probably the reason Ronnie [Harris] can't get us a letter [guaranteeing availability of the Firestone tires]."

9. Counsel may have withdrawn his petition in part because B & S recognized the potential impact that an injunction could have on the war effort of the United States. If so, we acknowledge and commend plaintiff's concession in this respect.

the standards for granting injunctive relief for that reason, though clearly plaintiff has not prevailed on the merits. The Record shows that the Army acted fairly and responsibly in its dealings with plaintiff B & S; it does not hint of animosity toward B & S or its president.

Defendant's motion for judgment on the Administrative Record is GRANTED. The Clerk of Court will dismiss plaintiff's Complaint. No costs.